IN RE: A.G.B., Juvenile Officer;

Missouri Department of Social Services, Children's Division, Respondents.

v.

E.B. (Mother), Appellant.

WD 80534

Missouri Court of Appeals, Western District.

OPINION FILED: OCTOBER 10, 2017

---

Sara H. Harrison, Jefferson City, MO, Kristen Burks, Macon, MO, Counsel for Respondents.

Cody M. Wells, Macon, MO, Counsel for Appellant.

Before Division Two: Edward R. Ardini, Jr., Presiding Judge, Anthony Rex Gabbert, Judge, Karen King Mitchell, Judge

Anthony Rex Gabbert, Judge

### Introduction

E.B. (Mother) appeals the circuit court's judgment terminating her parental rights to her biological child, A.G.B. Mother asserts three points on appeal. First, Mother contends that the circuit court erred in terminating her parental rights pursuant

to Section 211.447.5(3)[1] because the State failed to present clear, cogent, and convincing evidence that the conditions at the time of removal of the child persisted. Second, Mother contends that termination of her parental rights pursuant to Section 211.447.5(2) was against the weight of the evidence because the evidence presented did not indicate that Mother's mental condition prevented her from adequately parenting her child. Third, Mother contends that the court abused its discretion in finding termination of her parental rights to be in the best interest of the child because the evidence regarding the statutory factors set forth in Section 211.447.7 indicate Mother is a fit and able parent. We reverse all portions of the circuit court's Judgment relating to termination of Mother's parental rights.[2]

## Background Information

### Procedural History

A.G.B. was born July 24, 2014. On January 13, 2015, the circuit court ordered A.G.B. placed into protective custody for the reason that, "The mother reports she has mental health issues and cannot care for the child at this time." The court found removal of the child to have been based on an emergency thereby relieving the Children's Division from making reasonable efforts to prevent removal of the child from the home. However, the court also found that the Children's Division had attempted to provide Intensive In-Home Service to prevent removal. On February 24, 2015, A.G.B. was adjudicated to have been abused or neglected and without proper care, custody, and support pursuant to Section 211.031 based on the following findings:

a) Mother reported mental health issues including diagnosis of PTSD and bipolar.

b) Mother repeatedly reported to the Children's Division worker that she is tired and is struggling with caring for the child.

c) Mother reported that she is resentful of the child, struggles to provide care for the child, and gets so upset with the child that she has to leave the room.

d) After a safety plan[3] was implemented on January 10, 2015, as a result of Mother displaying emotional turmoil wherein she was crying and screaming, went to bed with the music loud and ignored everyone in the house, it was determined that the plan was not working.

The court ordered Mother to comply with the terms of the Written Service Agreement entered into with the Children's Division and that the Children's Division pay for any services required by the agreement.

Mother entered into her first Written Service Agreement with the Children's Division on February 11, 2015. The agreement required Mother to "address her mental health needs," "provide safe hous-

---

1. All statutory references are to the Revised Statutes of Missouri as supplemented through January 1, 2017, unless otherwise noted.

2. As the putative father and unknown father do not appeal the circuit court's Judgment terminating their parental rights for abandonment pursuant to Section 211.447.5(1), the portion of the court's Judgment terminating putative father's parental rights and unknown father's parental rights is undisturbed.

3. A "safety plan" was developed by the Children's Division in response to Mother's reports of being overwhelmed with caring for A.G.B. The safety plan was intended to provide intensive in-home services to Mother while keeping the child in the Mother's home. The in-home services never commenced due to the above incident.

ing," and "demonstrate family bonding." To fulfill these requirements, Mother was to schedule counseling appointments with a "Burrell [4] therapist," meet with a psychiatrist at Burrell, and sign releases for the Children's Division to speak with Burrell. The Children's division was to contact Burrell for updates. Mother was to locate safe, stable housing, provide a copy of her lease agreement, and meet monthly with the Children's Division. At the time A.G.B. was removed from Mother's care, Mother resided with her boyfriend, Bryan, and Bryan's mother in Macon. Mother and Bryan were to attend parenting class, sign releases, attend visits with A.G.B., and "demonstrate skills from parenting class." Shortly after Mother entered into the Written Service Agreement, Mother and Bryan moved from Macon to Columbia to be closer to the required psychological and psychiatric services.

A review hearing was held May 11, 2015. The court's docket entry for May 11, 2015, indicates that Mother had moved to Columbia and was continuing to have supervised visits with A.G.B. All parties were to continue to follow the "case plan."

A review hearing was held on August 10, 2015. On that date the court entered an order finding that Mother was "still working on the requirements of the Written Service Agreement." The court ordered that the Written Service Agreement continued to be followed. The court granted Mother "unsupervised visits for up to four hours per visit out in the community as long as Guardian Ad Litem approves of the visits."

The court held a permanency hearing three months later on November 9, 2015. At that time A.G.B. had been in foster care for ten months. At that hearing the court found that Mother was having weekly unsupervised visits with A.G.B. The court found that "services" were available to Mother in the form of "Family Support Team meetings" and "individual therapy." [5] The court found that Mother was continuing to work toward the goals of the Written Service Agreement. A docket entry on this date indicates that the previous goal of reunification changed from reunification to reunification with a *concurrent* plan for termination of parental rights and adoption. Mother was ordered to submit to a psychological evaluation. Mother's visitation was to "be arranged during the Family Support Team meetings."

The court held a permanency hearing on February 8, 2016. Pursuant to that hearing the court found that Mother was having weekly unsupervised visitation with the child and that Mother was continuing to work toward the goals of the Written Service Agreement. The permanency plan for the child was noted to be both reunification with Mother and adoption. Bryan was ordered to submit to a psychological evaluation. A review hearing was scheduled for April 25, 2016.

**4.** From the record it appears that "Burrell," formally named "Burrell Behavior Health," provides mental health services in Columbia, Missouri.

**5.** Although the record is clear that Mother attended Family Support Team meetings, the record contains no documentation as to how often these meetings occurred, what these meetings entailed, or how these meetings provided a "service" to Mother. The record is also clear that Mother attended individual therapy and psychiatric services as ordered. The Written Service Agreements signed by the Children's Division indicate that the Children's Division agreed to obtain progress reports regarding these services. The record is devoid of progress reports or any substantive information regarding how Mother responded to these services. No evidence from Mother's therapist or psychiatrist was presented at the termination of parental rights hearing.

Following the April 25, 2016, hearing, the court made a docket entry noting that psychological evaluations had been received for Mother and Bryan,[6] and that the Children's Division was "to provide good info on status of TPR petition @ review on 5/23/16."

Following the May 23, 2016, review hearing, the court entered a docket entry stating that the "status of TPR petition" would be reviewed at a June 13, 2016 hearing. A.G.B. had been in foster care for sixteen months. The court ordered that the Children's Division "provide parent aide for 6 hours per wk." Prior to the parent aide order, Mother was having unsupervised visitation with A.G.B. in Macon. The parent aide services replaced Mother's previous visitation schedule and Mother's visitation with A.G.B. was moved to Mother's home in Columbia to be supervised by the parent aide. The parent aide began supervising Mother's visitation in mid-June of 2016. Following a June case review the court made a docket entry stating, "TPR petition to be filed after DNA results known."

On August 29, 2016, the Children's Division petitioned the court to terminate Mother's parental rights. The Juvenile Officer was later joined as a party. On September 12, 2016, the court modified its May 23, 2016, docket entry that had previously stated that the Children's Division "provide parent aide for 6 hours per wk" to "[Children's Division] to 'make available' parent aide for 6 hours per week."

A permanency hearing was held on October 24, 2016. The court ordered that the Children's Division was "to continue to make available parent aide for 6 hours per week" granting Mother "6 hours of visita-tion per week with the parent aide in the home."

On January 4, 2017, the court held a hearing on the Children's Division's petition to terminate Mother's parental rights. At the termination of parental rights hearing, Children's Division Worker, Elizabeth Barr, testified that the Children's Division entered into a total of six Written Service Agreements with Mother, the first dated February 11, 2015. Barr testified that the Written Service Agreements represent goals that the Children's Division asks a parent to complete for a ninety-day period. She testified that Mother's Written Service Agreements set forth three goals. The first was to address Mother's mental health needs, the second was to provide safe housing, and the third was to demonstrate family bonding. When asked at trial if Mother addressed her mental health needs, Barr testified, "She did to a certain degree, yes." Barr agreed that Mother had obtained safe housing in Columbia and testified that Mother had met all four conditions set forth under the family bonding requirement. Barr testified that Mother attended parenting classes, attended the majority of visits with A.G.B., and demonstrated appropriate parenting skills "for the most part." Barr stated that Mother had attended medication management appointments regularly and that her lithium levels were in therapeutic range. She testified that she had not witnessed Mother to have any manic episodes in the year leading up to trial.

Barr testified that Mother was provided visitation with A.G.B. beginning almost immediately after A.G.B.'s removal in January of 2015. Barr testified that, when the visits started in January of 2015, they were supervised for approximately two hours

---

6. The psychological evaluation of Bryan was not entered into evidence or referenced at trial.

per visit, and this occurred for approximately three months. After three months, the visits "went to loosely supervised where they were at the Children's Division Office and Children's Division was in the room most of the time, but then also could step out for a few minutes if we thought that that situation was safe at the moment." Each of these "loosely supervised" visits lasted for approximately four hours. This visitation occurred for approximately three to four months. Barr testified that the progression from supervised visitation to "loosely supervised" visitation was due to Mother's progress and "improvement."

Mother's visitation with the child then progressed to "unsupervised in the community." Barr testified that Mother was to take the child to the local library for her visits. She stated that the Macon Library has a child room and a meeting room in the basement that could be used for visits. These visits were four hours in duration. Barr testified that the Children's Division was concerned that Mother relied too heavily upon A.G.B.'s maternal grandmother (Grandmother) or Bryan for assistance during visitation. Therefore, Mother was instructed that relatives were only allowed to participate in visitation with A.G.B. the first and last thirty minutes of the four-hour visits. Barr testified that Mother sometimes allowed Grandmother and Bryan in the visitation room more often than instructed. Mother had no driver's license and relied on Grandmother and Bryan for transportation from her home in Columbia to Macon for visitation. The unsupervised "community" visits occurred for approximately two months, and then the visits returned to being unsupervised at the Children's Division in Macon. Barr testified that the visits returned to the Children's Division because:

We were unaware where [A.G.B.] was during those visits. There were times when we didn't know visits were occur-

ring because she was not scheduling them with Children's Division. She would pick her up at the scheduled pickup time, and for one visit, in particular, she arrived at the Children's Division Office at 3:00 p.m. when she had picked [A.G.B.] up at 1:00, and so for two hours we didn't know that she had had her and she showed up at the Children's Division Office, and at that point my supervisor and Circuit Manager spoke with her and reviewed the visitation agreement that had been developed at the Family Support Team meeting.

The record does not indicate what the "visitation agreement" entailed or whether Mother had previously been advised that the court's order of "unsupervised visits in the community" meant that Mother was only allowed to take the child directly to the local library after picking the child up for a visit. Mother's unsupervised visits lasted until mid-June of 2016.

Barr testified that in April of 2016, after A.G.B. had been in foster care for fifteen months, A.G.B.'s Guardian ad Litem suggested that a parent aide be incorporated into the case. In mid-June of 2016, Mother's visitation went from unsupervised visits at the Children's Division in Macon to supervised visits by a parent aide at Mother's residence in Columbia. The parent aide testified that her services were "to supervise visits only." There was no evidence presented at trial that anything other than introduction of the parent aide prompted the change from unsupervised visitation to supervised visitation.

From June 16, 2016, to December 29, 2016, the parent aide supervised visits between Mother and A.G.B. The petition to terminate Mother's parental rights was filed by the Children's Division on August 29, 2016, approximately two and a half

months after the parent aide supervision began.[7]

A hearing was held on the Children's Division's termination petition on January 4, 2017. On February 23, 2017, the court entered a Judgment terminating Mother's parental rights pursuant to Section 211.447.5(2), with the court finding Mother to have a permanent mental condition rendering her unable to knowingly provide the child with the necessary care, custody, and control. The court also terminated Mother's parental rights pursuant to Section 211.447.5(3), finding that A.G.B. had been under the jurisdiction of the court for one year and the conditions which led to the assumption of jurisdiction still persist, with conditions of a potentially harmful nature continuing to exist, with little likelihood of a timely remedy to allow reunification in the near future. The court found that clear, cogent, and convincing evidence was presented by parent aide, Karen Bennett, and psychologist, Amy Fisch, to support termination of Mother's parental rights. Mother appeals.

### Standard of Review

Termination of parental rights is permitted when a statutory ground for termination is supported by clear, cogent, and convincing evidence and when termination is determined to be in the best interests of the child by a preponderance of the evidence. *In re A.M.S.*, 272 S.W.3d 305, 308 (Mo. App. 2008). "When the trial court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment this Court need only find that one of the statutory bases was proven and that the termination was in the best interests of the child." *In Re T.R.W.*, 317 S.W.3d 167, 170 (Mo. App. 2010). In our review, we "defer to the [circuit] court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *In re K.A.W.*, 133 S.W.3d 1, 11 (Mo. banc 2004).

[C]lear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true.

The constitutional implications of a termination of parental rights also inform the standard of appellate review. The bond between parent and child is a fundamental societal relationship. A parent's right to raise her children is a fundamental liberty interest protected by the constitutional guarantee of due process. It is one of the oldest fundamental liberty interests recognized by the United States Supreme Court. The fundamental liberty interest of natural parents in raising their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the State. Those faced with forced dissolution of their parental rights have a more

---

7. There is nothing in the record to indicate any specific event precipitating the filing of the petition. However, Section 211.447.2(1) provides that the Juvenile Officer or the Division shall file a petition to terminate parental rights of a child's parent if information available to the Juvenile Officer or Division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months. A.G.B. would have met the fifteen-month-mark for being in foster care on approximately April 11, 2016. The parent aide was recommended by the Guardian ad Litem in April of 2016 and was implemented in June of 2016. The Juvenile Officer or Division is not required to file a petition pursuant to Section 211.447.2(1) if the family has not been provided Section 211.183 services to facilitate reunification. § 211.447.4(3).

critical need for protections than do those resisting state intervention into ongoing family affairs. The termination of parental rights has been characterized as tantamount to a 'civil death penalty.' It is a drastic intrusion into the sacred parent-child relationship.

Consequently, when reviewing a trial court's termination of parental rights, appellate courts must examine the trial court's findings of fact and conclusions of law closely. Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship.

*In re K.A.W.* at 12 (internal quotation marks and citations omitted).

### Preliminary Comment as to the Circuit Court's Findings

Upon reviewing the record, we note that the bulk of the court's findings in its Judgment duplicate, verbatim, the allegations set forth in the Children's Division's petition. While we presume that the court chose to adopt the Children's Division allegations as findings of its own after consideration of the evidence, the court's verbatim recitation of the allegations leads to some indeterminate findings. For example, the court terminated Mother's parental rights in part pursuant to Section 211.447.5(2) which, as applicable to the allegations in this case, required the court to find Mother to suffer from a permanent mental condition rendering Mother "unable to knowingly provide A.G.B. with the necessary care, custody and control[.]" However, the court's findings state that "*Petitioner alleges* that Mother has a mental condition . . . ." Technically, therefore, the court made no finding of a permanent mental condition. Although we can infer from the court's Judgment terminating Mother's parental rights that the court must have found the statutory require-

ments for termination pursuant to Section 211.447.5(2) met, it is difficult to have confidence that careful consideration was given to findings that merely duplicate the Children's Division's petition allegations. These findings comprise the majority of the court's order. The court did, however, make additional findings as to what it considered clear, cogent, and convincing trial evidence supporting termination of parental rights. We review those findings below.

### Point I—Failure to Rectify

██ Mother contends that the circuit court erred in terminating her parental rights pursuant to Section 211.447.5(3), arguing that the State failed to present clear, cogent, and convincing evidence that the conditions at the time of removal of the child continued to persist.

Section 211.447.5(3) allows the court to terminate parental rights to a parent when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

In determining whether to terminate parental rights under this subdivision, the court is required to consider and make findings on the following factors: 1) compliance with terms of a social service program entered into with the Children's Division, 2) the success or failure of the efforts of the juvenile officer, Children's

Division, or other agency to aid the parent on a continuing basis in adjusting his or her circumstances or conduct to provide a proper home for the child, 3) a mental condition rendering the parent unable to knowingly provide the child the necessary care, custody and control, and 4) a chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control. § 211.447.5 (3) (a)(b)(c)(d). These factors "are not separate grounds for termination by themselves, but rather categories of evidence, that the court may consider along with all other relevant evidence in determining whether grounds for termination exist under § 211.447.5(3)." *In re S.Y.B.G.*, 443 S.W.3d 56, 60 (Mo. App. 2014). Although the court should consider and make findings on all factors, proof of just one factor is sufficient to support termination of parental rights. *Id.*

We agree that the Children's Division presented no evidence that the conditions leading to the assumption of jurisdiction still persist. The evidence at trial was that Mother's bi-polar disorder was being managed by medication. The Children's Division worker, Elizabeth Barr, testified that she had observed no "manic" episodes displayed by Mother throughout the year preceding trial. There was no evidence that Mother was overwhelmed by caring for A.G.B., such as was present at the time A.G.B. was removed from her care, or that Mother resented A.G.B. or became inappropriately upset with her. Consequently, the court's finding that the conditions leading to the assumption still persist is not supported by substantial evidence.

Section 211.447.5(3) also allows for termination of parental rights where conditions of a potentially harmful nature continue to exist with little likelihood of an early remedy. The court found this to be true and considered evidence presented by Karen Bennett, the parent aide, to be clear, cogent and convincing and to support termination of Mother's parental rights pursuant to Section 211.447.5(3).

Karen Bennett, testified that she was the owner of Family Beginnings, a company that contracts with the Children's Division to provide parent aide type services. Bennett was asked what her services with Mother entailed. She testified: "I didn't—my—as discussed with the Children's Division on this case, my goal was to supervise visits only." Bennett testified that she was primarily there to observe, but that she did intervene when the circumstances required it. She testified:

> So on other cases there's times that we provide more parent education. Whatever the family needs. There's a lot of topics as a parent/aide that we can cover—that are also a part of our services. Mom did receive some of those services. However, that was only during nap times and it wasn't every visit because she wasn't always engaged.[8]

Bennett testified that she was allotted six hours per week to supervise visits between Mother and A.G.B. She estimated supervising a total of twenty-six visits.[9] She testified that she took "very detailed notes" during the visits. Bennett's notes were entered into evidence at trial.

Bennett was asked what type of things she observed between Mother and the child during visitation. Bennett testified

---

**8.** She testified on cross-examination: "Parent aide services are a supervisory role."

**9.** The record indicates that, although Bennett was the primary parent aide supervising Mother's visitation, Bennett's daughter supervised some visits as well.

that the visits primarily consisted of Mother playing with the child. A.G.B. was nearly two years old when Bennett's parent aide supervision commenced. Bennett testified that "there were times that Mom would direct the play instead of the child" explaining that Mother "would play alongside and do her own thing." Mother would then prepare lunch after which A.G.B. would take a nap. Bennett testified that A.G.B. "always took a good nap" while at Mother's home. After A.G.B. woke up from her nap, she would resume playing with Mother.

Bennett was asked if Mother fed A.G.B. appropriately during visits. Bennett testified:

> There were concerns of expired food, spoiled foods. I believe there was a time that I was instructed [by Children's Services] to be aware that she had prepared a birthday cake. I believe it was a cake or cupcakes, I'm not really certain, but it had been cooked previously, and so I was alerted to watch to see if she attempted to serve that and she did. And so I remember having to intervene to say, 'that's too old.' And I believe there were times that the food was prepared after like it would be served, I would look at it and there were times that the food was expired and she didn't catch it. And you know, after maybe a couple times of that happening she did go through her cabinets and disposed expired food. I think in all honesty, though, there's feelings that shopping at the food banks sometimes get expired foods.

On cross-examination, Bennett stated that she had not examined the birthday cake to determine if it was actually safe to eat. Bennett testified: "I based it off what Children's Division told me. I'm directed by their services and I was told to not let her eat them[.]" There was no evidence in the record that Mother actually served spoiled food to A.G.B. Bennett's notes reveal an occasion where Mother served an expired apple sauce pouch to A.G.B. that Mother had obtained from the food bank, and another time when Bennett drew to Mother's attention that she was feeding yogurt to A.G.B. that had expired two days prior. Expired food in Mother's home was not an ongoing issue, however, as Bennett testified that, after these concerns were brought to Mother's attention, Mother emptied her cabinets of expired food.

Bennett testified that other situations that required her "intervention" included once when Bennett had to tell Mother not to leave the room while A.G.B. was eating, and once when A.G.B. was attempting to eat something that was a potential choking hazard, a pear, and Bennett had to advise Mother to "cut it off and serve it appropriately." Bennett testified, "Mom did not appear to have that knowledge." This incident does not appear in Bennett's notes. An incident wherein Bennett believed Mother cut A.G.B.'s food up too small does appear in her notes.

Bennett was asked why the "services" Mother was provided during nap times were not successful. She testified:

> Various reasons. There were times that I think mom would fall asleep. There were times that mom was uncooperative and unwilling. There were times that when I did provide the service she may be kind of preoccupied where she wasn't retaining the knowledge.

Bennett further testified:

> You know I remember one time I showed a simple thirty-minute video and there were questions that followed and she knew that, but she slept through it. There was on another time we showed a video on bipolar and living with bipolar and she was very attentive and can repeat that. So I feel that just depended

on if she was willing to seek the knowledge.

Bennett's notes capture the incident involving Mother falling asleep during Bennett's video. The visit occurred on July 14, 2016. The visit commenced with Bennett accusing Mother and Grandmother of not appearing at the visit on time.[10] Bennett's notes state that Bennett arrived at 9:50 a.m. for the 10:00 a.m. visit, but then left and parked down the street. Mother and Grandmother claimed to have been parked in back of the building, but Bennett noted that it appeared they had just arrived when Bennett returned at approximately 10:15 a.m. Bennett talked to Mother and Grandmother about the importance of being honest. Bennett told them that she was there "to provide services to prevent TPR." Grandmother attempted to ask questions of Bennett and Bennett advised Grandmother that she was only to ask questions that pertained to her and that Mother must ask questions that pertain to Mother. Bennett discussed the importance of "Mom being able to manage all aspects of this case."

Bennett recorded that Mother and A.G.B. played together in A.G.B.'s room and when they walked out A.G.B. smelled "poopy." Bennett "prompted" Mother to change A.G.B. and Mother replied, "I know, I was going to get wet wipes." Bennett pointed out that Mother sat down when she came out of the room and, "if she knew she should have taken care of" it. Bennett recorded that Mother became frustrated and walked away. Bennett asked Mother and Grandmother if they were "strong enough to get through the day."

Bennett recorded that she encouraged Mother to not do dishes that day and to spend time with Bennett. Mother complied. Bennett recorded that Mother had a copy of notes from a Family Support Team meeting that listed things that Mother needed to follow up on. Bennett asked Mother to re-create that list without using the notes. Bennett gave Mother five to seven minutes to complete the list; Mother was unable to do so. Discussion followed and Bennett noted that Mother had a "very poor attitude" and she encouraged Mother to "be aware of levels of frustration." Mother responded, "My level of frustration comes when people don't listen to me and talk all the time." Bennett explained that she would give Mother five minutes, without talking, to calm down. Bennett records that she told Mother to think about what she wanted to work on during nap time. Bennett records that Mother was never able to produce the requested list.

Bennett records that Mother's "level of frustration" continued to increase and Bennett "attempted to encourage Mom to own the issues/challenges identified in the case—focus on changes necessary." Bennett records that Mother began texting on her phone in the other room and doing dishes, not meeting with Bennett. Bennett advised Mother that they would watch a video at 12:53 p.m. Bennett could hear "very heavy sighs from Mom." At 1:03 p.m. Bennett noted that Mother was continuing to do dishes and advised Mother that the video had been waiting ten minutes and to "please come." At 1:04 p.m. Bennett started the video. The video was titled, "Trauma, Brain and Relationships: Helping Children Heal." Bennett told Mother that there would be a test at the end of the video. Bennett recorded that after thirteen minutes Mother appeared to be sleeping. Bennett recorded that she encouraged

---

10. The record suggests that, although the visitation was occurring in Mother's home, all parties were required to arrive at the home and also leave the home at the same time.

Mother to stay awake but Mother "struggles to stay awake." At 1:30 p.m. Bennett gave Mother the test covering the video. The test included questions such as, "____% of public dollars are spent trying to change the brain but spend ____% the first five years of life."; "Trauma creates _____."; "_____, _____ fear first and then treat the anger."; "_____ can yank the sole of your flesh away." While Bennett graded the test, Mother played with dolls, a stroller, and stuffed animals with A.G.B. in A.G.B.'s room.

Bennett asked Mother how she felt about the test. Mother replied that she probably did not do well. Bennett asked, "Can we learn if we are sleeping?" Mother replied, "No" and that she had had trouble sleeping. Bennett expressed concern with Mother's ability to stay awake with a toddler in the home. Mother explained that she took naps when the child did. Bennett explained that she should not do that. Bennett told Mother that it was important that if Bennett was providing education that Mother pay attention because the information was important. Bennett asked, "Is your daughter important to you? Did I see any attempts to stay awake even after prompted?" Mother replied, "No." Bennett explained to Mother that she scored less than 2% on the test. Bennett asked, "How will this look to the court system?" Bennett records that "Mom hangs head" and says, "Not very well." Meanwhile, A.G.B. requested a snack from Mother and Mother provided her with oranges and grapes.

At trial Bennett was also asked if Mother demonstrated an ability to give age-appropriate discipline. Bennett testified that she did not believe so. She testified that, on one occasion, she observed A.G.B. turn a sippy cup of milk upside down, spilling milk out of it. Bennett testified that Mother "raised her voice at [A.G.B.]" and called A.G.B. by her full name. Bennett did not believe the child's actions required that level of discipline and, consequently, did not consider Mother's discipline of A.G.B. appropriate.

## Review of Court Findings in Support of Termination of Parental Rights Pursuant to Section 211.447.5(3) Bennett's Testimony:

The court found the testimony presented by Bennett to be clear and convincing and to support termination of Mother's parental rights pursuant to Section 211.447.5(3). The court made the following findings based on Bennett's testimony:

a. She and another parent aid spent six hours per week every week for seven months in the home with Mother, child and other family members;

b. Even with the weekly instruction for seven months, Mother made no remarkable improvement in learning to raise her child;

c. Mother could not make rational decisions for herself or child in planning transportation or how to feed the child when away from home;

d. Mother did not recognize child's needs like hunger, or tiredness;

e. Mother could never articulate what she needed to improve on in order to reunify with her child;

f. Mother never acknowledged how the child came into Children's Division care, only incorrectly saying that she voluntarily had the child go into foster care;

g. Although never personally witnessed, Ms. Bennett saw signs of domestic violence at the home, such as fist-sized holes in the walls;

h. Mother did not have sufficient support that would be able to help her raise her child on a consistent basis;

i. That there was no reasonable likelihood that Mother could improve her parenting skills to a level that she could raise her child without significant daily support and supervision.

We review each of these findings in turn.

**Finding: Even with weekly instruction for seven months, Mother made no remarkable improvement in learning to raise her child**

Based on Bennett's testimony, the court found that, "[e]ven with weekly instruction for seven months, Mother made no remarkable improvement in learning to raise her child." Yet, Bennett testified that, although some "instruction" occurred during the child's nap time, Bennett was hired by the Children's Division to *supervise visits only*. We cannot conclude, therefore, that Mother received "weekly instruction" designed to facilitate reunification. Bennett testified that more extensive parenting education and instruction was offered to other families that was not available to Mother. Consequently, even if we could determine from the record what "remarkable improvement" was expected of Mother, and we cannot, we refuse to hold Mother accountable for failing to benefit from a service that was not provided to her. This finding is not supported by substantial evidence.[11]

Further, as indicated, although Bennett testified that Mother made no "remarkable improvement," it is difficult to ascertain from the record what "improvement" Bennett or the Children's Division was expecting. Notes from Bennett's July 8, 2016, visit provide insight into Mother's parenting practices around the time Bennett's supervision commenced. These notes also provide insight into Bennett's and the Children's Division's interaction with Mother as well as Mother's frustration with the lack of clarity as to the Children's Division's expectations.

During Bennett's July 8, 2016 visit, Bennett recorded that, upon Bennett's arrival, Mother changed A.G.B.'s diaper without prompting and helped the child with handwashing thereafter. The child colored. Mother talked to A.G.B. about picking up her crayons and coloring book. Mother colored with A.G.B. The child gathered the crayons and put them in a bag Mother provided. Mother praised A.G.B. by saying "good job" and clapping her hands. Mother played peek-a-boo and acted like a horse. Mother helped A.G.B. with puzzles and praised her when she was successful. Mother started lunch at 11:40 a.m. She fed A.G.B. fried chicken, carrots, scalloped potatoes, strawberries, and yogurt. A.G.B. ate well. Mother praised A.G.B. and put her down for a nap at 12:20. Bennett recorded that the "transition" into the nap went well. Mother changed A.G.B.'s diaper, washed her hands, and tucked the child in. Mother began doing dishes.

At that point, Bennett began talking to Mother about the case. Bennett asked Mother why she had a parent aide. Mother replied, "To help me learn how to be a better parent." Bennett asked, "What does that look like?" Mother replied, "I really couldn't tell you because everything I've learned from my family is wrong according to (worker)." Bennett recorded that Mother fell asleep at 12:34 p.m. in the middle of their conversation but woke up at 12:45 p.m. when Children's Division worker, Elizabeth Barr, arrived. At that point, both Bennett and Barr began asking questions.

11. We note that, although Bennett suggested in her testimony that Mother was not receptive to or cooperative with Bennett's "services," Mother was never a "no show" to visitations and never refused to allow Bennett to supervise the visitation. Visitation supervision was Bennett's stated purpose.

Mother was asked about how to properly parent a two-year-old and how she dealt with temper tantrums. Mother stated, "I'm not sure. I try to calmly talk to them." Mother was asked how to redirect a child from danger and what danger is. Mother responded with "if a cord was out" and "keeping her out of the kitchen." Mother was asked about the term "terrible two's" and what that meant. Bennett recorded that Mother appeared frustrated and "asked worker for any suggestions." Bennett recorded that Mother became frustrated when Barr suggested there was domestic violence in Mother's home. Barr then told Mother that she was "making things really difficult"; she stated that they were there to help but "instead you are fighting." Bennett recorded that the Children's Division worker was "very encouraging" and left at 1:20 p.m.

Mother then told Bennett that she also learned that she should sleep when the child sleeps—take a nap when they do.[12] Bennett asked Mother about social and emotional developmental milestones for fourteen to twenty-four month olds. Mother reported that she had read the information but did not have it memorized. Bennett recorded that "Mom continued to be frustrated displaying poor attitude." Bennett asked Mother how they could "get past this display of bad attitude." Mother replied that she did not know because she did not trust a lot of people. She reported that her father left her when she was three years old. She stated, "How can somebody help me when I don't trust them. You say there is domestic violence going on but you won't tell me what it is. I can't trust people that don't understand." Bennett recorded that, Mother expressed frustration with Bennett texting in Mother's presence when Bennett had advised Mother that she was not supposed use her own phone during visits. Bennett justified her own telephone use by explaining to Mother that she was texting the foster parent to confirm visitation dates.

Bennett asked Mother what her frustrations were. Mother replied, "You assume domestic violence [but] don't listen to me." Bennett recorded that she explained to Mother concerns noted by the Children's Division in their referral to the parent aide. Bennett then called the Children's Division worker to "clarify." Mother expressed that no one had ever communicated to her what the concerns regarding domestic violence were. Bennett recorded that Mother began texting on her phone and Bennett asked her, "Who is your support, who are you texting?" Mother replied, "Why do you need to know?" Bennett asked Mother what she would like to talk about. Mother replied that she just wanted A.G.B. home and that when there was a hostile environment between Bryan and Bryan's mother, she had to get A.G.B. out of there. Bennett recorded that Mother was "emotional."

A.G.B. woke up at 1:50 p.m. Mother changed A.G.B.'s diaper and fixed A.G.B.'s hair. The child played with Mother's childhood Cabbage Patch dolls. Mother showed A.G.B. that the "baby" had a diaper and encouraged the child to take the diaper off. Mother showed A.G.B. how to put the diaper back on. Mother showed the child how to dress her doll. Mother read to A.G.B. and encouraged A.G.B. when reading. Bennett recorded that A.G.B. repeated what Mother read, pointed to pictures, and turned pages. Bennett recorded that Mother used good emotions when reading and asked A.G.B. questions.

---

12. Bennett did not record her response to this statement, but at the July 14, 2016, visit the following week, Mother was advised that she should never sleep while a toddler is taking a nap.

Bennett asked Mother if she had given anything to the foster parents to support A.G.B. Mother replied that she had given a few clothes, Christmas and birthday presents, and two pairs of shoes.[13] Bennett asked when more could be expected. Mother replied that on Thursday of the following week she would provide a full pack of diapers with wipes. (At the end of the visit Bennett recorded that Mother was to begin providing diapers and wipes weekly to the foster parents.)

Bennett recorded that A.G.B. threw a stuffed animal. Mother told her, "Don't throw," and tried to take the toy while A.G.B. tugged at it. Bennett recorded that she "prompted Mom" that she needed to tell A.G.B. why the toy was taken and instead of using "don't" she could have told A.G.B. to hug the bear. Bennett explained that Mother should tell her child what to do instead of what not to do and explained "how don't works." Bennett recorded that Mother played with A.G.B. in A.G.B.'s room and then provided orange sherbet ice cream as a snack.

Bennett discussed with Mother how long A.G.B. had been in her foster home. Mother stated that she was aware that the foster parents had expressed an interest in adopting A.G.B. and that Mother did not want that to happen. Bennett recorded that she encouraged Mother to talk to the Children's Division worker and Mother's attorney "in regards to adoption."

Bennett reported that she then attempted to discuss concerns with Mother that Mother's medication was in the kitchen on top of the refrigerator. She advised Mother to lock up her medication. Bennett recorded that Mother became frustrated and questioned how A.G.B. could reach the medication. Bennett explained that two

year olds can climb and showed Mother how A.G.B. might move chairs and climb. Bennett walked through the house advising Mother as to childproofing. Mother looked at pictures with A.G.B. at the end of the visit.

After reviewing the record we conclude that, although the court found Mother to have made no "remarkable improvement," as Bennett's testimony and notes record no glaringly deficient parenting by Mother such as would warrant termination of her parental rights, and we cannot ascertain from the record what "improvement" was being sought, this finding is not supported by the evidence. Moreover, if "improvement" by Mother was necessary to ensure the safety of the child in her care, expectations regarding how Mother could demonstrate that "improvement" should have been articulated to Mother and should be apparent in the record. While Bennett's notes record that Mother was repeatedly asked what she needed to improve on, there is no record of Mother being advised as to what Bennett or the Children's Division expected her to improve on.

### Finding: Mother could never articulate what she needed to improve on in order to reunify with her child

Based on Bennett's testimony, the court found that, "Mother could never articulate what she needed to improve on in order to reunify with her child." Bennett's notes consistently record Mother being unable to acknowledge what steps she needed to take to reunify with her child. However, it is not clear from the record that Mother was ever informed what those expectations were. Bennett's notes suggest a Socratic method of "teaching" by Bennett and an

13. The record reflects that, at some point, Mother began paying child support directly

from her Social Security Disability benefits.

ongoing power struggle between Bennett and Mother that sometimes resulted in Bennett ending Mother's visitation early. Children's Division Worker, Elizabeth Barr, was asked at the termination hearing whether at any time she thought Bennett was "deficient." Barr responded:

I'm not sure deficient would be the right word. I think there have been times when maybe she was a little adversarial with [Mother], but I also agree with what the parent aide said, is that probably any person in that role might have had an adversarial relationship with [Mother] as [Mother] doesn't seem very open to receiving suggestions or information about improving her parenting.

Bennett's August 15, 2016, visit with Mother provides insight into how Bennett approached the issue of what Mother "needed to work on." Bennett recorded that she asked Mother what she wanted to work on and what the Children's Division had identified that she work on. Mother responded that she did not know—she thought she had done everything that had been asked.[14] Bennett asked Mother what the role of the parent aide was. Mother responded: To help me find a good way to parent my child. I don't know. I really don't know honestly—it feels like having supervised visits again." Bennett asked Mother why the "team" agreed to parent aide services—what the Children's Division was looking for. Mother responded, "Violence in the home—to make sure there's not which there isn't. To make sure it's safe." Bennett asked, "How do we determine violence in the home?" Bennett recorded that Mother then became frustrated. Bennett asked Mother, "When the team talks about violence in your home, what specifically are they referring to?"

Mother left to check on A.G.B. who was coughing.

Bennett asked Mother what her goal was. Mother responded, "My child home." Bennett asked, "What needs to happen?" Mother responded, "To cooperate." Bennett asked, "How do we cooperate?" Mother responded, "By having someone who will listen—because you turn things around." Bennett asked Mother what Mother was doing right. Mother responded that she was taking care of A.G.B., loving A.G.B., and being her mother. Bennett then asked Mother, "What month are you in?" Mother responded that A.G.B. had been in custody twenty-one months. Bennett asked, "Have they had discussions about termination of parental rights?" Mother acknowledged that if her rights were terminated, A.G.B. would be adopted. Bennett asked, "Based on this information—discussing terminating your rights—how do you avoid termination?" Mother responded, "Do everything I can, like I have been."

Mother then discussed with Bennett that she felt that people were using her disability against her—making her feel like she was stupid and could not raise a child. She stated, "I rely on my instincts and that's what I will always rely on—oh hell yeah—and my family." Bennett asked, "How can someone teach you parenting skills?" Mother replied that she learned from her mother and sister—if she was not sure about something she would ask them. Bennett asked, "Do you feel there is anything a parent aide can teach you?" Mother responded, "I really couldn't tell you because I rely on my family. They were around before DFS invented ... (illegible). Bennett asked, "How does the team move forward?" Mother responded, "I'm

14. Significantly, the Children's Division worker testified that Mother substantially complied with all aspects of her Written Service Agreements. The court reached the same conclusion in its termination Judgment.

not the team so I can't tell you." Bennett asked, "Why can't you identify what you need?" Mother responded that the only thing that Bennett had identified was domestic violence. Bennett asked, "What is preventing your child from being placed with you today." Mother responded, "The Macon County Team" and again suggested that her disability was being used against her—that A.G.B. was a "healthy white child" they wanted to "put up for adoption." Bennett asked what that had to do with Mother's parenting skills. Mother stated that she could parent just fine without someone looking over her shoulder.

Bennett asked, "When will you be able to fulfill their expectations?" Bennett then asked Mother to list three goals to accomplish. Bennett recorded that Mother became "emotional," started folding clothes, and "appears unwilling to work." Bennett waited "approximately seven minutes" and asked Mother "to repeat the question." Mother could not. Bennett recorded that Mother stated: "You walk into someone's home with an attitude and wonder. . . ." Bennett recorded that, after nine minutes Mother still could not identify goals. Bennett asked Mother what her expectations are. Mother replied, "I have no idea. The only reason I'm doing this is because I don't want my child gone. It's hard when someone only writes lies about what I say." Bennett asked Mother "if we need to terminate visit—if services aren't working." Bennett recorded that she "attempted to encourage Mom to cooperate with services." Bennett recorded that Mother was sobbing "without tears" and Bennett drew Mother's attention to her lack of tears. Mother responded that she did not "fake cry." Bennett gave Mother "more time to identify goals," explaining that Bennett "does not just do nothing," and that Mother "must have goals." Bennett recorded that Mother continued to be emotional "without tears."

Bennett recorded that she gave Mother a few minutes to calm down and then asked Mother, "Do you want the services?" Mother asked, "How's that going to help bring my daughter home? If it will help then yes." Bennett asked if the courts had identified parent aide services as necessary. Mother reported that she did not believe so. Bennett recorded Mother to be "uncooperative/unwilling" and that she could not identify how the parent aide services could benefit her. Bennett recorded, "Due to lack of cooperation—visit cancelled." Mother called Grandmother and Bryan who arrived soon thereafter. Bennett reported that she attempted to review notes with Mother, however Mother was folding clothes and "doesn't appear interested." Bennett recorded that Mother "talks with Bryan" and that Bennett told Mother that sidebar conversation should not happen again.

We find the August 15, 2016, parent aide visit representative of the majority of Bennett's visits with Mother, with Bennett demanding to know from Mother what she needed to improve on but never articulating suggested improvements to Mother when Mother was unable to think of anything. Further, Mother's expressed frustrations sometimes led to Bennett threatening to terminate her services—Mother's only source of contact with her child at that point.

Mother's September 28, 2016, visit was terminated early because Bennett's daughter, the parent aide on that date, was concerned that Mother was using a recording device during visits. According to Bennett, Mother had previously been told that she could hand write notes during visits but that a recording device was not allowed. Mother initially denied, but ultimately admitted, that she had attempted to record her visit. Bennett told Mother

that their service was a contracted service that they were not obligated to provide and that they could terminate. She advised Mother that, if Bennett's services were terminated, Mother would have no other options for parent aide services. Bennett then advised Mother that she needed to be able to identify "how parent aide services had helped her up until now with Family Beginnings and, should the decision be made to continue services, how they can help." She told Mother that Family Beginnings would make a decision at a later date as to whether they would continue to provide services.

We conclude that, it was the Children's Division's obligation to articulate to Mother what she needed to improve on in order to reunify with her child, not vice versa. This finding does not support termination of Mother's parental rights.

### Finding: Mother could not make rational decisions for herself or child in planning transportation or how to feed the child away from home.

Based on Bennett's testimony the court also found, in support of termination of Mother's parental rights that, "Mother could not make rational decisions for herself or child in planning transportation or how to feed the child away from home." This finding is not supported by substantial evidence. Prior to Mother's visits being held in her home in Columbia, Mother arranged transportation from Columbia to Macon to attend approximately 362 hours of visitation with her daughter. Mother had no driver's license and utilized family supports for transportation. There is no evidence in the record that the transporta-

tion Mother arranged through relatives was ever concerning or deficient.[15] The Children's Division determined, however, that Mother was too dependent on family supports, particularly in seeking guidance for the care of her child, and limited Mother's ability to utilize these supports.

The "transportation" decision the court references in its Judgment is derived from Bennett's testimony that, in December of 2016 (four months after the Children's Division filed to terminate Mother's parental rights and just prior to trial) the Children's Division wanted to see if Mother "could utilize public transportation [in Columbia] to get from point A to point B." Mother suggested going to the mall to visit Santa and the Children's Division suggested she go to Bass Pro where Santa photos were free. Mother planned a transit route to Bass Pro. Bennett testified that the Children's Division cancelled that trip when Bennett called the transit system the morning of the visit and discovered that there were no sidewalks on the route, extensive walking would be required, and the route was through a high crime area in Columbia. There was no evidence presented at trial, however, that a better route was available.

The Children's Division subsequently decided that the visit should occur at the mall. Mother planned a trip to the mall the following week. On the morning of the visit, the Children's Division texted Bennett and advised her that the "purple route" was the quickest route to the mall. Bennett asked Mother if she chose the quickest route. Mother stated that she did not; she chose the route that she was most

---

**15.** The record reflects that, when the foster parent questioned Mother's installation of A.G.B.'s car seat, Mother purchased a new car seat that was easier for her to install. The foster father supervised approximately six visits when A.G.B. was first placed into care and testified that the Children's Division had requested that he transport the child because Mother was often very emotional when the visits ended. He testified that he was not aware of any safety issues "with someone else providing transportation."

familiar with. Bryan had agreed to pay for lunch that day but, due to the Children's Division's rule that he could only spend limited time with Mother and A.G.B. during visitation, he had to separate from Mother and A.G.B. upon arriving at the mall. Because he had misplaced his phone that morning, he was not readily accessible after they separated. Mother, Bryan, and A.G.B. ultimately did meet in the mall and ate before leaving. Bennett testified that she did not believe that Mother adequately prepared for the trip, however, because "the purpose of the trip was to get a picture with Santa" and Mother had "nobody to take a picture." Bennett testified that, "in the past I have taken pictures."

We find that, even if Mother had completely failed the transportation challenge that the Children's Division created, that failure would not support termination of Mother's parental rights. The overwhelming weight of the evidence is that Mother had the ability to and did make rational, appropriate decisions for herself regarding transportation when she was allowed to utilize all options available to her.

### Finding: Mother did not recognize the child's needs like hunger, or tiredness

Based on Bennett's testimony, the court also found in support of termination of Mother's parental rights that, "Mother did not recognize the child's needs like hunger, or tiredness." There is no evidence in the record to support this finding. To the contrary, Bennett's notes reflect that Mother consistently fed A.G.B. timely, well-balanced meals, provided appropriate snacks, and provided A.G.B. with naps during every visitation. Bennett testified that A.G.B. always napped well while with Mother.

Bennett testified that she supervised approximately twenty-six in-home visits with Mother. Bennett's notes reflect that, during one of Bennett's first visits, Mother started lunch at 11:40 a.m. and prepared a meal of fried chicken, carrots, scalloped potatoes, strawberries, and yogurt. After lunch, Mother put A.G.B. down for a nap. During another visit Mother prepared meatloaf, peas, and mashed potatoes. On another visit Mother provided chicken nuggets, cottage cheese, green beans, and watermelon. She gave A.G.B. milk to drink during these meals. During one visit Mother prepared pigs-in-a-blanket, potatoes, peas, and sliced strawberries. At another time Mother served goulash, green beans, and grapes. On another visit she prepared catfish, mixed vegetables, cottage cheese, mashed potatoes and oranges. During one visit A.G.B. helped mother fix "pistachio delight." At another visit A.G.B. helped Mother make and ice sugar cookies.

As there is simply no evidence to support the court's finding that Mother failed to recognize the child's needs, like hunger and tiredness, this finding was not supported by substantial evidence.

### Finding: Mother never acknowledged how the child came into Children's Division care, only incorrectly saying that she voluntarily had the child go into foster care

Based on Bennett's testimony, the court also found in support of termination of Mother's parental rights that, "Mother never acknowledged how the child came into Children's Division care, only incorrectly saying that she voluntarily had the child go into foster care."

The record shows that, during parent aide visits Bennett persistently asked Mother why A.G.B. was in foster care and persistently advised Mother that it was concerning that she was unable to articulate why the child came into care. Bennett's notes from her first visit with Mother on June 16, 2016, however, show that

Mother described how A.G.B. came into care from Mother's perspective. Mother discussed that she was accused of neglecting A.G.B. when A.G.B. was five months old. Mother discussed that she was suffering from post-partum depression and was not wanting to go back on her medication for her bi-polar disorder.[16] Mother described that she "was scared" at the time. Mother described that she was given the choice of the child going to Bryan's mother or going into foster care, and she chose foster care.

At this very first visit by Bennett, Bennett discussed with Mother that A.G.B. had been in foster care for seventeen months and that the Children's Division could move to terminate Mother's rights after fifteen months of the child being in care. Mother indicated that termination of parental rights "scares me" and that she knew the foster parents wanted to adopt A.G.B. Bennett then asked Mother how Mother could improve if she "could not identify what happened." Bennett never described to Mother from Bennett's perspective how A.G.B. "came into the Children's Division's care."

Approximately three months later on September 15, 2016, Bennett's daughter recorded that Mother reported that A.G.B. was removed from her care for "neglect" when someone called in a hotline on her. She reported that she was given the choice between guardianship with Bryan's mother or foster care. Mother stated that she chose foster care instead of having A.G.B. continue to live "in a hostile environment with Bryan's mom." Mother reported that part of the hostile environment was "also due to her not being on her medications at

the time [A.G.B.] came into care." Mother reported that she no longer lived in a hostile environment, however, and that she and Bryan had worked together as a couple.

We find that Mother's assertion that she placed the child into foster care is not wholly inconsistent with the court's Judgment assuming jurisdiction in the matter. The court assumed jurisdiction based on the following findings:

a) Mother reported mental health issues including diagnosis of PTSD and bi-polar.

b) Mother repeatedly reported to the Children's Division worker that she is tired and is struggling with caring for the child.

c) Mother reported that she is resentful of the child, struggles to provide care for the child, and gets so upset with the child that she has to leave the room.

d) After a safety plan was implemented on January 10, 2015, as a result of Mother displaying emotional turmoil wherein she was crying and screaming, went to bed with the music loud and ignored everyone in the house, it was determined that the plan was not working.

These jurisdictional findings support Mother's belief that she sought the Children's Division's help in protecting A.G.B. at the time the child was placed into foster care. These findings also reveal Mother's insight into her own instability at the time A.G.B. was removed from her care, as well as Mother's insight into how her own instability was potentially detrimental to her child's welfare. These findings reveal that Mother recognized her parental vulnerabil-

---

16. Mother described in a psychological evaluation that she suffered from PTSD and took lithium for a bipolar disorder. When she was advised that the medication could harm her unborn child, she quit taking the medication while pregnant. After she delivered A.G.B., Mother believed that she would be okay to remain off of the medication but later realized that she could not.

ities at that time and articulated those to the Children's Division.

We cannot conclude that Mother never acknowledged how the child came into the Children's Division care. This finding is not supported by substantial evidence. Further, even if Mother's perception of the specific facts regarding the child's removal was different from the Children's Division's, we cannot conclude that any misperception on Mother's part would support termination of her parental rights.

**Finding: Although never personally witnessed, Ms. Bennett saw signs of domestic violence at the home, such as fist-sized holes in the walls**

Based on Bennett's testimony, the court also found in support of termination of Mother's parental rights that, "Although never personally witnessed, Ms. Bennett saw signs of domestic violence at the home, such as fist-sized holes in the walls." This finding does not support termination of Mother's parental rights. Mother and Bryan were living together at the time A.G.B. was taken into protective custody. They were still a couple at the time of the termination of parental rights hearing. Although Mother admitted to having been abused when she was seven by her stepfather and by a male roommate when she was older, Mother denied that there was domestic violence between Mother and Bryan. Mother admitted that there had been turmoil in the home between Bryan and Bryan's mother at the time A.G.B. was removed from the home, and reported that this was one reason she chose for A.G.B. to go into foster care. The Children's Division offered no proof of domestic violence. The Children's Division required Mother and Bryan to attend couples counseling. They complied. The Children's Division offered no evidence at trial regarding the results of this counseling. Bryan was ordered to submit to a psychological examination. He

did. No evidence was offered at trial regarding this examination. In short, speculation as to holes observed in walls that were believed by the Children's Division to have been caused by Bryan does not support an inference of domestic violence such as would support termination of Mother's parental rights. *See In re S.F.M.D.*, 447 S.W.3d 758, 765 (Mo. App. 2014)

(The fact that Mother was a victim of domestic violence on two occasions in the two days immediately before the child was placed in protective custody does not establish that she was neglectful in her parenting of S.F.M.D. Likewise, the fact that the father of her child has a history of violent and/or criminal acts at some point in his past does not establish that Mother was neglectful.).

**Finding: Mother did not have sufficient support that would be able to help her raise her child on a consistent basis**

Based on Bennett's testimony, the court also found in support of termination of Mother's parental rights that, "Mother did not have sufficient support that would be able to help her raise her child on a consistent basis." This finding is not supported by the record. The record reflects that the Children's Division believed Mother relied too heavily on outside support and, consequently, limited Mother's access to family during her visitation with A.G.B. The Children's Division required that Mother not use her cell phone during visitations to seek outside advice or support. Mother never presumed to be all-knowing as a parent and told Bennett that most of her parenting advice came from her mother and sister. Mother was denied access to these resources during visitation.

Mother and Bryan were cohabiting at the time A.G.B. was removed from Mother's care and were still a couple at the time

of the termination hearing. Although Mother was required to complete couples therapy with Bryan, and Bryan was ordered to submit to a psychological evaluation for the Children's Division, the only indication in the record as to the reason Mother was unable to access his support during visitation is that the Children's Division believed Mother abdicated too much caretaking responsibility to Bryan when he was present.

We find that, while attempting to ascertain Mother's abilities to parent in situations where she might have no support available was not completely improper, because the Children's Division limited Mother's access to her familiar supports, it is unfair and impossible to reach the conclusion that Mother lacked sufficient support to assist her in raising her child. This is not something she was given the opportunity to prove. Consequently, this finding is not supported by substantial evidence.

**Finding: That there was no reasonable likelihood that Mother could ever improve her parenting skills to a level that she could raise her child without significant daily support and supervision.**

Based on Bennett's testimony, the court also found in support of termination of Mother's parental rights that, "there was no reasonable likelihood that Mother could ever improve her parenting skills to a level that she could raise her child without significant daily support and supervision." Clear, cogent, and convincing evidence does not support this finding. The record is devoid of meaningful, reunification based services that explained to Mother her perceived deficiencies, much less helped her overcome them. Consequently, Mother was

deprived of the opportunity to demonstrate her ability to improve any perceived deficiencies.

It is significant to note that, in order for a court to terminate parental rights pursuant to Section 211.447.5(3), the child must have been under the jurisdiction of the court for a period of one year and the conditions which led to the assumption of jurisdiction must still be present, or conditions of a potentially harmful nature must be present, with little likelihood that those conditions can be remedied at an early date. In terminating parental rights under this section the court must consider, among other things, the success or failure of the efforts of the juvenile officer, Children's Division, or other agency to aid the parent on a continuing basis in adjusting his or her circumstances or conduct to provide a proper home for the child. Section 211.183.1 requires the Children's Division to "make reasonable efforts ... after removal, to make it possible for the child to return home." [17]

> 'Reasonable efforts' means the exercise of reasonable diligence and care by the division to utilize all available services related to meeting the needs of the juvenile and the family. In determining reasonable efforts to be made and in making such reasonable efforts, the child's present and ongoing health and safety shall be the paramount consideration.

§ 211.183.2. "The division shall have the burden of demonstrating reasonable efforts." § 211.183.3.

At the time the child had been under the jurisdiction of the court for one year, Mother was having unsupervised visitation with the child. The record is unclear as to what "aid" the Children's Division was

17. There are some circumstances, inapplicable here, where reasonable efforts are not required.

providing Mother to help her adjust her circumstances to address continued concerns of the Division. The Children's Division entered into multiple Written Services Agreements with Mother. These agreements were designed to put Mother on notice as to the expectations of the Children's Division. Significantly, the court found in its termination Judgment that "Mother has largely complied with the Written Service Agreements entered into with the Children's Division." This finding is supported by the record. Mother was asked to attend individual counseling. She complied. Mother was asked to attend couples therapy with Bryan. She complied. Mother was asked to manage her mental issues through psychiatric intervention and medication. She complied. Mother was asked to attend parenting classes. She complied. The Children's Division acknowledged at trial that Mother had substantially complied with all terms of her Written Service Agreements.

It was not until the child had been under the jurisdiction of the court for nearly seventeen months that parent aide services were offered and, according to the testimony of the parent aide, were only offered to supervise visitation. The parent aide testified that, although more extensive services were available to other families, "As discussed with the Children's Division on this case, my goal was to supervise visits only." Bennett was asked by Mother's attorney at trial if, rather than "supervised visit," a more accurate characterization of her service to Mother would be "an interim step between unsupervised visitation to possibly transitioning into something like an overnight or weekend visit." Bennett disagreed. Bennett testified,

I don't think—I mean that wasn't the goal of the parenting. I think the goal of the parenting services was for us to get a report back from someone to let us—because it was a much longer term, because what Children's Division did was usually just for a couple hours at a time. So they were wanting something that was in the home and a long period of time to see whether the mom could parent properly in a lengthy time.

Based on this direct testimony from a Children's Division witness, it is questionable whether the parent aide was a service provided to Mother pursuant to Section 211.183.1 to "make reasonable efforts . . . after removal, to make it possible for the child to return home" or if it was an evidentiary tool for the Children's Division's termination case. According to the court's docket entries, the Children's Division had started drafting its termination petition nearly three months before parent aide services were ever offered. Mother was receiving extensive unsupervised visitation prior to the parent aide service; Mother spent 362 hours of visitation with the child prior to the parent aide. Two and a half months after the parent aide started, the Children's Division petitioned to terminate Mother's parental rights. The court found the parent aide's testimony to provide clear, cogent and convincing evidence to support termination of Mother's parental rights. The record does not support these findings.

### Conclusion Regarding the Court's Findings Pursuant to Section 211.447.5(3)

After careful review of the record and trial transcript, we find all of the aforementioned findings related to Bennett's testimony to be unsupported by substantial evidence. The court erred in terminating Mother's parental rights pursuant to Section 211.447.5(3). Mother's first point on appeal is granted.

### Point II—Irreparable Mental Condition

 Mother contends that termination of her parental rights pursuant to Section

211.447.5(2) was against the weight of the evidence because the evidence presented did not indicate that Mother's mental condition prevented her from adequately parenting her child. We agree.

Section 211.447.5(2) allows for termination of parental rights when the child has been abused and neglected and the court finds at least one of four statutorily defined conditions to exist. The court terminated Mother's rights pursuant to Section 211.447.5(2)(a) which requires the court to find "[a] mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child care, custody and control."

�full ▆▆▆ "The disability or disease of a parent shall not constitute a basis ... for the termination of parental rights without a specific showing that there is a causal relation between the disability or disease and harm to the child." § 211.447.10. "Thus, when termination is based on a parent's mental illness, courts must take great care to identify a causal connection between the disability and harm to a child before terminating parental rights." *In re T.J.P., Jr.*, 432 S.W.3d 192, 202 (Mo. App. 2014) (internal quotation marks and citations omitted).

A mere finding of even severe mental illness is insufficient to support termination. A termination of parental rights on grounds of mental illness requires substantial evidence that the incapacity is so severe that it renders the parent incapable of providing minimally acceptable care. Moreover, even a finding that a parent is unable to provide the necessary care may be insufficient to support termination based on mental illness if the parent has access to additional support because parenting is frequently a group effort.

*Id.* at 203 (internal quotation marks and citations omitted).

Here, the court found evidence presented by psychologist, Dr. Amy Fisch, to be clear, cogent and convincing evidence in support of termination of Mother's parental rights pursuant to Section 211.447.5(2). Dr. Fisch testified regarding a psychological evaluation she performed on Mother. This evaluation was conducted on February 29, 2016, approximately fourteen months after A.G.B. was placed into foster care. Dr. Fisch testified that the evaluation was requested by the Children's Division to identify parenting strengths and weaknesses and to indicate treatment needs. Dr. Fisch reported that "[Mother] presented for the evaluation in casual attire which was appropriate to her age and the weather, but not necessarily the situation." Dr. Fisch testified that Mother attempted to project herself in an abnormally positive light during her interview which invalidated some clinical scales on the evaluation. Dr. Fisch diagnosed Mother with Dependent Personality Disorder, Bipolar II Disorder, and Borderline Intellectual Functioning. Dr. Fisch did not observe Mother and A.G.B. together but generalized from the results of her testing the type of parenting and/or parental deficiencies that could be expected from such results. Dr. Fisch testified that she believed, based on her testing, that Mother had some deficiencies related to parenting that would be difficult to overcome without long-term treatment. Dr. Fisch reported "concerns about [Mother's] understanding of child development and parenting skills" in spite of Mother having attended two parenting classes. There were no details presented by Dr. Fisch, or included in the record on appeal, as to the duration, content, or format of the parenting classes Mother attended. Dr. Fisch testified to having no

personal knowledge of the content or curriculum taught in those classes. There was testimony that one parenting class was taken prior to the Children's Division becoming involved in the case.

Dr. Fisch testified that her testing was not an exact science and acknowledged that many of the conclusory statements in her report were in terms of possibilities and not definite outcomes. Dr. Fisch concluded that, to enable return of the child to Mother's care, treatment for Mother would need to be long-term with extensive support. She recommended that individual therapy for Mother continue, that Mother and Bryan attend couples therapy, that Mother "continue to work on obtaining the resources and assistance necessary to establish a stable and enriching living environment for her family," that Mother "may need assistance with career counseling or job placement so that she will be better able to adequately provide for her family's financial and material needs," that Mother continue to receive corrective feedback during her interactions with her daughter, and that Mother be encouraged to be open and receptive to this information. Dr. Fisch testified that, "[s]hould reunification be considered, increased in-home monitoring is recommended to monitor the living environment and to ensure that the parenting skills [Mother] is learning are being properly and consistently applied."

Based on Dr. Fisch's testimony, the court made the following findings to support termination of Mother's parental rights pursuant to Section 211.447.5(2):

a. It is unlikely Mother could provide for the child's physical needs and emotional wellbeing if the child spent more than a limited time with Mother;

b. Mother's disabilities alone are not preventing reunification, but a combination of her disabilities and her inflexible thinking and misperception of her own limitations and the needs of the minor child;

c. There are concerns about Mother's ability to provide adequate care without considerable assistance or supervision from others;

d. Mother has a hard time recognizing the needs of others when they are different from her own such as the child's dietary needs, effective supervision techniques, and age-appropriate discipline;

e. Mother has dependency issues, with an example of going to work with paramour at Wal-Mart for the entire day on multiple occasions with her child without recognizing her child's needs;

f. That within a reasonable degree of psychological certainty, it is likely Mother will have problems raising a child;

g. It is the best interest of the child that Mother's rights be terminated.

While it has never been contested that Mother suffers from bipolar disorder, she has managed this disorder with medication throughout the pendency of this case. Mother spent hours and hours of unsupervised visitation with A.G.B. There is no significant evidence in the record suggesting that Mother failed to meet A.G.B.'s physical or emotional needs during those visits. Likewise, parent aide records reveal no glaring instances during Mother's six-hour in-home visitations of an inability of Mother to provide for A.G.B.'s emotional needs and physical well-being. To the contrary, the parent aide notes reveal that Mother provided structure, instruction, and nurturing to A.G.B.; she also provided well-balanced meals and naps. Dr. Fisch never observed Mother and A.G.B. together. The parent aide records reveal no overly concerning deficiencies in Mother's di-

etary choices for the child, supervision techniques, or age-appropriate discipline. The incidents of Mother spending days with the child at Wal-Mart occurred prior to A.G.B. being placed in foster care and at a time when Mother was admittedly overwhelmed and not controlling her bipolar disorder with medication.

In light of *In re T.J.P., Jr.*, even if Mother were unable to provide adequate care to the child without considerable assistance, this would not support termination of her parental rights if she had appropriate supports available to help raise her child. Here, the Children's Division required Mother to demonstrate an ability to parent *without* supports. While Dr. Fisch concluded, within a reasonable degree of psychological certainty, that "it is likely that Mother will have problems raising a child," the same could be said for any parent. Such suppositions do not support a conclusion that Mother suffers from an irreparable mental condition that renders her unable to provide A.G.B. with proper care, custody and control.

We conclude that the record does not reflect clear, cogent, and convincing evidence supporting the court's determination that Mother suffers from a permanent mental condition rendering her unable to knowingly provide A.G.B. with proper care, custody and control. The court erred in reaching this conclusion. Mother's second point on appeal is granted.

### Point III: Best Interest of the Child

Mother contends that the court abused its discretion in finding termination of her parental rights to be in the best interest of the child because the evidence regarding the statutory factors set forth in Section

211.447.7 indicate Mother is a fit and able parent.

As we conclude that clear, cogent, and convincing evidence does not support termination of Mother's parental rights, we need not consider whether the court abused its discretion in analyzing the statutory factors set forth in Section 211.447.7.[18] Consequently, we will not fully address this point on appeal. We would be remiss if we did not note, however, that some of the court's findings pursuant to Section 211.447.7 are erroneous.

Section 211.447.7(2) requires the court to consider "[t]he extent to which the parent has maintained regular visitation or other contact with the child." Regarding this factor the court found that "Mother has maintained minimum contact with the minor child." The record shows that Mother took advantage of nearly every opportunity the Children's Division gave her to visit her child resulting in 362 hours of visitation prior to the parent aide starting and approximately 169 hours thereafter. To not credit Mother with "regular visitation" and suggest that 531 hours of visitation represents only "minimum contact" disregards Mother's evident constancy regarding visitation.

Section 211.447.7(1) requires the court to consider the child's "emotional ties to the birth parent." Here, the court found that, "The minor child has few emotional ties to Mother." There was no substantial evidence at trial to support this. Parent aide Bennett was asked at trial: "In your observation of [A.G.B.] and [Mother], does there appear to be a bond between the two of them?" She responded: "I'm not certain that there is, a parent/child bond. There— I mean the child recognizes her and calls her 'Mom', but does not have the under-

18. Our legislature provided in Section 211.447.6 that a best interests of the child inquiry is only relevant if it appears by clear, cogent, and convincing evidence that grounds exist for termination of parental rights.

standing of the role of a mother and what that entails, so no, I do not feel they have a mother/child bond." Yet, a two or three-year-old's perception of "the role of a mother and what that entails" is irrelevant as to whether the child actually has a bond or attachment to the parent. Further, Bennett's testimony contradicted itself. She also testified that she observed Mother initiating contact with the child and the child initiating contact with Mother. She observed Mother and A.G.B. hugging each other and Mother and A.G.B. kissing each other. She observed Mother to use a reasonable tone of voice with A.G.B., to talk positively to A.G.B. about A.G.B.'s foster parents, and to praise and encourage A.G.B. Bennett testified that all of these things were, "good things" and "also attachment-based behaviors." When asked if "attachment-based behaviors" referenced "a parent-child bond" Bennett responded, "Yes." Bennett recorded in her notes that during one visit A.G.B. was very "clingy" and wanted Mother to hold her constantly.

Section 211.447.7(7) requires the court to consider "[d]eliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm." Here, the trial court found that "Mother knew or should have known that minor child was subject to a substantial risk of harm because Mother neglected the minor child and reported her inability to care for the minor child." Yet, this finding references the reasons the child first came under the jurisdiction of the court and makes no reference to present or predicted behavior of Mother.

> [I]t is insufficient merely to point to past acts, note that they resulted in abuse and neglect and then terminate parental rights. Past behavior can support grounds for termination, but only if it is convincingly linked to predicted future behavior. There must be some explicit consideration of whether the past acts provide an indication of the likelihood of future harm.

*In re K.A.W.*, 133 S.W.3d at 9-10.

In short, findings regarding Section 211.447.7 factors must be supported by evidence and a cursory glance at the court's Section 211.447.7 findings reveal that they were not.

### Conclusion

We conclude that the circuit court erred in terminating Mother's parental rights pursuant to Section 211.447.5(3). There was no clear, cogent, and convincing evidence supporting the court's determination that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, such that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to Mother in the near future. We also conclude that the circuit court erred in terminating Mother's parental rights pursuant to Section 211.447.5(2). There was no clear, cogent, and convincing evidence supporting the court's determination that Mother suffers from a permanent, irreparable mental condition rendering her unable to knowingly provide A.G.B. with proper care, custody and control.

All portions of the circuit court's Judgment relating to termination of Mother's parental rights are reversed. We are cognizant that, although insufficient evidence was presented to terminate Mother's parental rights, the circuit court continues to maintain jurisdiction over A.G.B., including oversight of Mother's ongoing efforts to reunify with A.G.B. and the Children's Division's responsibility to assist Mother in that regard. Future considerations, find-

ings, and Judgments by the court may rely on information and evidence obtained after the circuit court's February 23, 2017 Judgment.

All concur.