2011 Ark. App. 251

Kimberly REDWINE, Appellant

v.

Bobby and Brenda TURNER, Appellees.

No. CA 10–1082.

Court of Appeals of Arkansas.

March 30, 2011.

Richard Jarboe, Walnut Ridge, for appellant.

Jeremy B. Lowrey, Sheridan, for appellees.

WAYMOND M. BROWN, Judge.

This case involves the use of an established easement on property located in Sharp County. After she purchased her property, appellant Kimberly Redwine had a dispute about the use of an easement on her property, used for the benefit of her neighbors, appellees Bobby and Brenda Turner. After a trial, the court entered the order from which Redwine appeals.

She contends that the circuit court erred by requiring the parties to share the expenses of maintaining the easement and adjacent fence, by requiring the fence to remain on the property, and by not allowing her to install gates at the end of the easement. The circuit court did not clearly err in any of these rulings; therefore, we affirm.

The parties are adjacent landowners. The Turners purchased twenty acres in rural Sharp County in 2006. Redwine bought the adjacent forty acres, to the west of the Turners, in 2009. Redwine's property is subject to a twenty-foot-wide easement that runs along the north border of her property. This easement connects the Turners' property to a county road, allowing ingress and egress. Redwine's fiancé, Kevin Coursey (a party below, but not to this appeal), leases land north of Redwine's property.

This dispute involves use of the easement itself as well as fences and gates along the easement. In February 2010, the Turners filed a complaint against Redwine and Coursey, seeking a declaration establishing their rights to the easement, an injunction preventing Redwine and Coursey from interfering with the easement, and an order directing Redwine and Coursey to pay for damages to the easement and the adjoining fence. Redwine filed a counterclaim against the Turners, but the counterclaim was voluntarily dismissed.

The circuit court held a trial in May 2010, where the parties presented testimony. Mrs. Turner testified that her and her husband's plan was to move onto the property five years after the purchase, but they moved onto the property in 2008 when their house burned. In March 2007, they had someone bulldoze and clear the easement, costing them about $6200. They put a mobile home on the property in September 2008. At that time, there was a fence on the north side of the easement acting as a boundary fence. When they moved onto the property, they put gates on both ends of the easement to keep the neighbor's horses from getting off the property. They also posted signs to keep others from trespassing onto the property. Mrs. Turner denied that the signs were designed to keep Redwine and Coursey off their properties. In 2009, the Turners built a fence along the south side of the easement and removed the gates at the end of the easement. Mrs. Turner testified that, with the fence, the gates became unnecessary. Accordingly, they removed the gates from the easement. There had been issues with Redwine's cattle getting free from her property, but Mrs. Turner stated that the cattle never got through the fence on the south side of the easement. Mr. Turner conceded that the fence might have been ugly, but he stated that it kept horses and cows on the property.

Mrs. Turner stated that problems began in December 2009 when she received a letter from Redwine's attorney, accusing the Turners of trespassing. There were other heated disputes involving the Turners and Coursey as well, including one dispute that led to Mrs. Turner's son being charged with terroristic threatening.

In January 2010, someone put a gate back on the easement, and Redwine sent the Turners a key to the gate. The Turners stated that the gate caused a hardship on them. The gate is located close to a county road. They had to use four-wheel drive to cross the easement. Mrs. Turner described one instance where she stood outside for fifteen minutes trying to unlock the gate. Mr. Turner slipped on the ice one day and busted his mouth on the gate. Mrs. Turner was also concerned about the delay that would be caused by the gate if she ever had to take her grand-

son, who has asthma, to the hospital. After these incidents, the Turners talked to their attorney, filed this lawsuit, and removed the gate.

The Turners were also concerned about Coursey's use of the easement. Mrs. Turner testified that Coursey used a backhoe to move big bales of hay (for feeding his cows). This caused ruts and other damage to the easement. Mrs. Turner opined that there was no reason to use the road to dump hay on the south side of the fence.

Redwine testified that, when she purchased the property, there were gates installed on the easement and that the gates were consistently closed. She denied that there was a fence along the south side of the easement at that time. Her plan was to put livestock on the property, but she did not put the livestock on the property until there was a boundary fence installed on the backside of the property (where it meets the Turners' land). Redwine recalled an occasion where the Turners were on their property. They were retrieving horses that had escaped from their property, and Redwine told them that she had shooed the horses back to their (the Turners') property. Mrs. Turner then told Redwine that she talked to Redwine's predecessor about putting up a fence. Mrs. Turner and Redwine discussed the matter, and Redwine agreed to allow them to put up a fence as long as it was the same quality of fence she and Coursey were constructing on the border between the Redwine and Turner properties. Redwine claimed that livestock had escaped through the Turners' fence several times, most recently in April 2009. With regard to using a backhoe on the easement, both Redwine and Coursey testified that it was the only way they could feed the cattle on the property. Redwine denied that Coursey's backhoe did any damage to the easement. When asked if it would be fair to ask him

to maintain the easement, Coursey stated that he had done no more damage than a normal person would. He also believed that he and Redwine should not be responsible for maintaining their own property.

The court ruled from the bench after hearing testimony from the parties. First, it reaffirmed the Turners' right to use the easement for ingress and egress. Regarding the fence, the court stated:

Now, the question of whether there is a necessity for a fence along the south side, in this case, the south side of that twenty foot easement comes down to what is reasonable under these circumstances. If the south fence is not there at all, since Ms. Redwine runs livestock on her property, that's going to require a gate at both ends of the easement, at the county road and then again where the easement enters the Turner property. Because of various reasons, such as the proximity of where the gate was to the county road, that makes it difficult to get out and open the gate without your vehicle sticking out in the road. In bad weather it makes it sometimes treacherous to do so, and, then again when you get up to the other gate they've got to do the same thing. This is where they live, and it is probably not reasonable to require somebody to go through two gates that they have to get out and then open, go through, get out again and close, and do that two times, so that means exiting your vehicle twice and somebody standing out in the inclement weather and closing the gate behind them and all of that, that's—we've got to figure out a way to allow that not to happen, and the way for that to work is for there to be a fence along the south side.

For purposes of this lawsuit, the Court is going to determine that … a fence along the south side of that prop-

erty is necessary for reasonable use of this property as an access for ingress and egress from the Turner property. That also—that will make it so that it's not necessary to have a gate at either end. It does create some other problems, and that is that it makes it less convenient for Ms. Redwine to access the back part of her property because she's got to go around to the road. And so it may be that it is necessary that there be one or more gates installed in that south, what we're calling the lane fence, and I would think that Ms. Redwine should be able to put a gate at any point, as many gates as she wants along that thing, at whatever place she wants, as long as, once again, as it does not interfere with the use of the easement.

. . . .

So we've got a situation here where both parties need to use what's described as this lane. I'm convinced that those folks need access to that to be able to get back past the marshy parts to be able to feed their livestock on the back side of their property back there, and so they're going to have to use it. And both parties also need the fence. Now Mr. Coursey says they don't need the fence, but if we're going to keep that open so that the Turners can come in and out without the blockage, they need the fence to keep their livestock in, and so that means we're going to have to have a fence that's adequate and proper fence to do that. I'm looking at these photographs, I mean obviously can a cedar post fence be adequate, of course it can, properly installed.

However, there's going to be a lot more maintenance on that, and there's metal posts the rest of the way. There was a metal post fence installed as a boundary between the Redwine property and the Turner property that was installed by Ms. Redwine or Mr. Cour-

sey, and there was some evidence that there was some agreement, even though probably a very informal agreement, that, you know, we'll build this part of the fence if you all will build one along the lane.

So from all of this, it's determined that the twenty foot easement will be bordered on the south side by a lane fence that will be constructed of metal posts and five strand of barbwire. It's to be properly built so that it holds, holds cattle. . . .

The court made the Turners financially responsible for building a fence to the court's standards within sixty days of the order. It also authorized Redwine and Coursey to install gates along the fence anywhere they felt they needed one. It then made Redwine and the Turners equally responsible for maintaining the road and the fence:

Once this is done, then since both parties are using the fencing and need the fencing, and both parties are using the lane, the maintenance of the fence and the lane will be divided equally. Now, what that means is that—and so that there's not any disagreement about this—if either party gets to the point where they think there needs to be some repair work done, if the fence is down or the fence is needing repair work, then the repair work can be done, and the parties can split the cost of it. If the roadway needs to be fixed, if either party says we need to fix the road here, then the work will be done, and you all will split the costs.

Now, what that will do is that will keep everybody honest about this, you know. If I want the fence repaired, I know I'm going to bear half the costs. Now, it's probably a good deal because I'm only going to bear half the costs, but

on the other hand, if it doesn't really need it, I'm not going to incur that expense just to hurt the other guy. Do you see what I mean? Same thing with the roadway.

. . .

Now, look, here's another thing that will do. I know that you all believe, whether it's true or not, you all believe that Mr. Coursey came in there and was cutting those things around and maybe he was doing that just to irritate you all, you all probably believe that, I don't know if it's true or not. I'm just saying regardless of any of that, if you have something like this where the costs are going to be divided, if he's doing that, that will cause him not to be too interested in doing that any more. On the other hand, because you're bearing half the costs too, it will keep you from wanting to get the road repaired just to irritate him, because it's costing both of you when it happens. So if it needs to be repaired, if either of you think it needs to be repaired now, then by all means, once again, repair it and split the costs.

These oral findings were made part of the court's decree. Redwine then filed a timely notice of appeal.

■ We review cases that traditionally sound in equity de novo on the record, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous.[1] A finding is clearly erroneous when, although there is evidence to support it,

the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.[2] In reviewing a circuit court's findings, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony.[3] Disputed facts and determinations of witness credibility are within the province of the fact-finder.[4] It is our duty to reverse if our own review of the record is in marked disagreement with the circuit court's findings.[5]

■ First, Redwine argues that the circuit court erred by requiring her to share in the expense of maintaining the road and fence. She argues that this was an error as a matter of law, relying on excerpts from our decision in *Wilson v. Johnston*[6] and from American Jurisprudence. We decline to reach this issue, as it is not preserved for our review.

In *Lamontagne v. Arkansas Department of Human Services*,[7] our supreme court clarified the law as it pertained to appeals from a court sitting in equity. It reaffirmed the point that, even in equity cases, a contemporaneous objection is necessary to preserve a matter for appellate review. Quoting *Roberts v. Yang*, the supreme court wrote, "[I]t is incumbent upon the parties to raise arguments initially to the circuit court and to give that court an opportunity to consider them. . . . Otherwise, we would be placed in the position of reversing a circuit court for reasons not addressed by that court."[8]

---

1. *Carson v. County of Drew*, 354 Ark. 621, 128 S.W.3d 423 (2003).

2. *Id.*

3. *Id.*

4. *Id.*

5. *Id.*

6. 66 Ark.App. 193, 990 S.W.2d 554 (1999).

7. 2010 Ark. 190, 366 S.W.3d 351.

8. *Id.* at 6, 366 S.W.3d at 354 (quoting *Roberts v. Yang*, 2010 Ark. 55, at 6, 370 S.W.3d 170, 174); *see also Buehne v. Buehne*, 2010 Ark. App. 390, 2010 WL 1790773.

Here, Redwine never objected when the court told her that she would be responsible for subsequent repairs to the easement or the fence, nor did she raise the matter via a post-trial motion. The circuit court never had the opportunity to rule on this matter, and this court is precluded from considering the issue here.

Second, Redwine argues that she should be allowed to remove the fence on the south side of the easement and install gates at each end of the easement. She does not provide a convincing argument as to why she should have these gates other than evidence showing that the property was used for livestock before the grant of the easement. True, use of the property is among the factors to be considered when determining whether a party can install a gate at the end of an easement.[9] Other factors include the terms of the grant, the intention of the parties as reflected by the circumstances, the nature and situation of the property, the manner in which it has been used and occupied before and after the grant, and the location of gates.[10] But there was no testimony regarding the use of the property before the grant of the easement (Redwine's citations to the abstract are of testimony relating to use of the easement before the Turners moved onto the property, not before the establishment of the easement). There were no gates on the easement when the Turners purchased their property. The court also found that the gates were unnecessary with the construction of the fence on the south side of the easement; that the gates create a hazard, given their proximity to the county road; and that the fence should remain given the parties' informal agree-ment as it pertained to the fence. The court's findings are supported by the Turners' testimony.

Along these same lines, Redwine contends that the circuit court's ruling interferes with her right to enjoy her own property. She asserts that the circuit court permanently restricted the use of her property. She contemplates a time when her estate may be combined with the property being leased by Coursey, and she states that she would risk a contempt finding if she were ever to remove the fences. She also asserts that removing the fence would eliminate the need to put the backhoe in reverse down the easement after hauling hay.

We will not base our decision in this appeal on what may happen in the future, particularly in the absence of any testimony showing that the parcels will be combined at some point in the future. Instead, we note that the circuit court balanced the equities and issued a remedy. In arguing that the court has interfered with her right to use the property, Redwine ignores the fact that the court ordered Mr. Turner to build the fence to prevent cattle from escaping, and it allowed her to install as many gates on the fence as necessary. At the same time, this would allow the Turners ingress and egress to their property without facing the hazards caused by going through the gates.

When the remedy at law is inadequate, equity will fashion a remedy to effect justice suitable to the circumstances of the case and to enforce a legal right.[11] This is a classic case of a court exercising

---

9. *See Jordan v. Guinn,* 253 Ark. 315, 485 S.W.2d 715 (1972).

10. *Id.*

11. *Mid–America Pipeline Co. v. Lario Enters., Inc.,* 942 F.2d 1519 (10th Cir.1991); *Wilson v. Goldman,* 699 P.2d 420 (Colo.App.1985); *Mid–America Pipeline Co. v. Wietharn,* 246 Kan. 238, 787 P.2d 716 (1990).

its powers of equity to fashion a remedy. We do not have a definite and firm conviction that a mistake occurred when the circuit court allowed the Turners to install a fence rather than rely on gates at each end of the easement, and the circuit court did not err as a matter of law in requiring Redwine to share in the responsibility for maintaining the easement or the fence. For the reasons stated, we affirm.

Affirmed.

VAUGHT, C.J., and GRUBER, J., agree.