Cite as 2025 Ark. App. 613

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-24-320

| | |
|---|---|
| GEORGE ROTHWELL | Opinion Delivered December 10, 2025 |
| APPELLANT | |
| | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTH DIVISION |
| V. | [NO. 60DR-23-28] |
| TERRY ROTHWELL | |
| APPELLEE | HONORABLE SHAWN J. JOHNSON, JUDGE |
| | |
| | SUBSTITUTED OPINION |
| | |
| | PETITION FOR REHEARING GRANTED IN PART; AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

**BART VIRDEN, Judge**

George Rothwell ("Ben") appeals the amended and substituted divorce decree ending his forty-year marriage to Terry Rothwell ("Terry"). Ben's appeal challenges seven of the court's findings valuing and dividing the couple's marital property. We affirm in part and reverse and remand in part.[1]

---

[1]On September 17, 2025, this court issued its opinion found at 2025 Ark App. 431, ___ S.W.3d ___. On October 3, appellant filed a petition for rehearing arguing, *inter alia*, that the court of appeals erred in holding that the appellant failed to preserve the issue of the distribution of $13,907 in attorney's fees. We agree with appellant that the issue was preserved on appeal and hereby grant the appellant's petition in part and vacate the opinion found at 2025 Ark App. 431, ___ S.W.3d ___, and issue this substituted opinion therefor.

I. *Facts and Procedural History*

The parties married in 1981. They do not have children. In 1986, they founded Celerit Corporation ("Celerit"), an S corporation that provides information-technology consulting services to banks.[2] Terry is the sole shareholder and the CEO of Celerit, but the parties do not dispute that Celerit is marital property. Ben had limited involvement in Celerit during the marriage and served on the company's board of directors until 2020, when Terry removed him from the board and barred him from the Celerit building. Celerit constitutes the majority of the parties' marital estate. The parties also own CRE Holdings, LLC, a real estate holding company, which leases an office building and data center to Celerit.

During their marriage, Terry focused on running Celerit, and Ben managed the couple's personal finances and investments. The parties' principal disputes include two of Ben's investments: his creation in 2016 of Eskimo & Tucker's Gold, LLC, a gold-mining venture, and his investment in a treasure-hunting venture in the Philippines, which began in 2017. These investments never produced any income or profit.

On June 15, 2020, Ben filed a complaint for divorce,[3] and on August 5, the circuit court entered an agreed temporary order pending the outcome of the divorce to address the

---

[2]The parties also own Celerit Solutions Corporation, which was not profitable at the time of the divorce and was being consolidated with Celerit.

[3]The case was initially filed in Cleburne County Circuit Court but was transferred to Pulaski County Circuit Court in December 2022.

parties' use of three jointly owned lines of credit ("LOCs"); their two primary homes—one in Heber Springs and one in Little Rock; their bank accounts; and Celerit. The order stated in relevant part that, although both parties have equal and open access to the LOCs because both parties' names are on them, LOC1, a $1 million business LOC, would continue to be used by Celerit for business purposes only; LOC2, a $2 million LOC, could be used by Terry to draw up to $250,000 pending the divorce; and LOC3, a recently opened $1 million LOC, could be used by Ben to draw up to $250,000 pending the divorce. The temporary order required the parties to agree in writing to any funds drawn by either party over $250,000. The parties acknowledged that any assets acquired or liabilities incurred were marital in nature and would be adjudicated by the court at the final hearing. The order further provided that Celerit employee Karen Johns would continue paying all the Rothwell's personal expenses from their joint checking account and that the Celerit operating account would "maintain up to $600,000." Terry was to pay any operating-account funds in excess of $600,000 toward the outstanding balance of LOC2. The order also required Terry to provide Ben with Celerit's monthly financial reports. Finally, the parties agreed that Terry could withdraw up to $250,000 from LOC2 to complete renovations on the Little Rock home.

In December 2022, Ben filed a motion to show cause, a motion to amend the temporary order, and a motion to compel the sale of Celerit. Relevant to this appeal, Ben alleged that Terry violated the temporary order by refusing to "sweep" the Celerit operating account to pay down LOC2 when the amount exceeded $600,000, by refusing to provide him with Celerit's monthly financial reports, and by instructing Ms. Johns not to pay the

3

expenses for the treasure-hunting venture. In January 2023, Ben filed a motion for attorney's fees, alleging that Terry had restricted his access to marital funds, leaving him no money to pay "bills" that included several invoices for his attorney's fees and costs that he had submitted to Ms. Johns for payment but she did not pay. Ben alleged that the LOCs were "maxed out" and that the joint checking account was empty. He also requested the court to award him past and future attorney's fees and costs.

At a hearing on his motion for attorney's fees, Ben's attorney clarified that Ben was not requesting attorney's fees from Terry. Rather, he was asking the court to give him access to marital funds in order to pay his attorney. Terry argued that Ben did have marital funds to pay his attorney but had paid a treasure hunter over $50,000 in the previous four months instead. Ben acknowledged that Ms. Johns had paid his living expenses but said that she did not pay an invoice from his attorney, for the ongoing expenses of the treasure-hunting venture, or for his maid. He said they had paid $12,600 a month for the venture since 2017, claimed that he had individually been paying it since Ms. Johns stopped paying it four months earlier, and admitted that he had funded the venture rather than paying his attorney. The court denied Ben's motion for attorney's fees.

On March 6, Terry filed a motion for contempt and to modify the temporary order, alleging that Ben violated the temporary order by withdrawing funds in excess of $250,000 from LOC3 as well as the other LOCs without her agreement and stating that the LOCs were "maxed out." The court held a hearing on May 8 on Terry's motion and on Ben's remaining motions.

At the May hearing, Ben testified that Terry, through Ms. Johns, paid for all his living expenses, three credit cards that he used regularly, various home repairs, and several vacations; that he had two retirement accounts he could draw from but chose not to; and that he was educated and in good health. He said he earned approximately $5,000 per month from rental income and oil and gas leases. Regarding the gold-mining and treasure-hunting ventures, Ben said that he had invested in gold-mining leases in 2016 and had also purchased over one million dollars' worth of gold-mining equipment. He explained that he began the treasure-hunting venture in 2017 by paying Nathanial Ellis $150,000 a year to hunt for treasure in the Philippines, that Mr. Ellis was a truck driver before Ben hired him, that there was no written contact between him and Mr. Ellis, that Ben had never been to the Philippines to check on the progress Mr. Ellis was making, that Mr. Ellis had not found any treasure in the seven years that Ben had been paying him, and that Ben had paid Mr. Ellis over $900,000 since the venture began. Ben said that he started the venture without Terry's knowledge in 2017 because she had recently suffered a heart attack. He said that Terry stopped authorizing the $12,600 monthly payment to Mr. Ellis for the venture in November 2022; thus, he (Ben) had made the payments himself since that time. He testified that he made the payments with cash from his safe, which contained the oil and gas revenues he had been saving for years. Finally, he said that he had also invested money in another treasure-hunting venture called Seafarer and had recently purchased approximately $60,000 in boat motors for that venture from a marine dealership in Fort Lauderdale. He admitted that Terry had not agreed to the purchase.

Terry testified that she provided Ben with quarterly reports from Celerit, explaining that the accounting firm no longer prepares monthly reports. She said that the three LOCs were maxed out with a total owed of $4,000,000. She understood that the temporary order required her to sweep the Celerit account to pay down the LOCs but said that she had not done so in order to preserve the marital estate. She claimed that if she swept the account to pay down the LOCs, Ben would "take all of the money within days." She said that she had not known about Ben's treasure-hunting investment and monthly payments to Mr. Ellis until 2020 when she was looking at Ms. Johns's computer after Ben filed for divorce. After she learned from Ben's deposition that Mr. Ellis was a truck driver, that they were wiring $12,600 to him in Idaho every month, that there was no written contract between Mr. Ellis and Ben, and that it was unclear what happened to the money after it was wired to Mr. Ellis, she asked Ms. Johns to stop making the monthly payments. She said that she had no involvement in any of their investments: her responsibility was the company, and Ben's was investments. She testified that neither the Philippines investment nor the gold-mining investment nor the Seafarer investment had ever produced income.

Ms. Johns testified that she was an employee of Celerit and paid all the personal expenses of the parties. She said that in 2022, Ben's living expenses were $361,529.18, and Terry's were $135,613.77. In addition to living expenses, she testified that since the temporary order was entered in August 2020, Ben had withdrawn $895,720 from LOC2; $115,000 from LOC3; and $24,600 from LOC1. She said that the "vast majority" of these expenses were related to treasure hunting or stock purchases. She said that Terry had spent

6

a total of $1 million renovating their home in Little Rock, $404,996.32 of which was spent since entry of the temporary order.

On May 16, the court entered an order denying the parties' motions for contempt and their motions to modify the temporary order; however, the court ordered Terry to pay Ben $154,996.32 from the Celerit operating account as an "early property settlement." The court found that this amount represented the difference between the amount the temporary order authorized Terry to spend completing renovations to the parties' Little Rock home ($250,000) and the actual cost of the post-temporary-order renovations ($404,996.32). The court stated that the $154,996.32 "shall be accounted for and credited to" Terry in the final division of property. The court also forbade Ben from accessing any funds from the LOCs. Finally, the court reserved Ben's motion to compel the sale of Celerit for the final hearing.

After mediation in July 2023, the parties entered into an agreed order on August 3 regarding the division of many of their marital assets and debts and agreed that the principal issues left for the court to decide included the valuation of Celerit and Celerit's and Celerit Solutions' office buildings. The agreed order further provided that "[n]othing in this order negates any arguments regarding marital waste or financial responsibility which may impact the division of marital property and credits to be issued."

A final hearing was held on August 3. At this hearing, Terry testified that the parties started Celerit in 1986 to provide temporary IT consultants to various businesses. She said that she is and has always been Celerit's CEO. Terry testified that she did not know the value of Celerit because she was "not an appraiser." She explained that she opined in her

7

November 2022 deposition that Celerit was worth between $20 and $25 million because Ben had included that amount on a 2022 financial statement. She also testified that Celerit's profit margins had changed over the past three or four years due to a merger between BancorpSouth, their largest client, and Cadence Bank.

Terry said that Celerit would continue to need its office building and the data center where Celerit Solutions currently operates once it absorbs Celerit Solutions because the Celerit systems are located there and Celerit will continue to keep all the employees. Terry testified that the office building and data center were appraised for $1,625,000 in March 2022 in connection with the sale of Celerit to Sollensys, which was not consummated. She said that Ben had agreed with the terms of the sale.

Terry testified that any distributions she had received from Celerit since the temporary order had been used to pay interest on the LOCs. She said that between 2020 and 2023, she had paid $451,000 in interest on LOC1 and LOC2. Defendant's Exhibit D10A indicates that the total interest paid on all three LOCs from 2020 through the date of the hearing was $498,570.69. Terry said that after the temporary order was entered, she initially swept the Celerit operating account to pay the LOCs as required but eventually quit because Ben removed money from the LOCs every time she paid them down. She said that this was in spite of the fact that she paid all of Ben's living expenses, credit cards, and health insurance. She said Ben had never "paid for anything" or "put a penny in the bank accounts."

Terry stated that she had no, or very little, involvement in managing the parties' personal finances during the marriage. She did not look at their bank statement or

8

QuickBooks, pay any bills, keep up with the personal lines of credit, or make personal investments. She said that her responsibility was to take care of the company, the employees, and the clients and that she trusted Ben to take care of their personal finances and investments. She also testified that Ben worked with their accountants to prepare the parties' tax returns each year and that she had never personally reviewed them.

With specific regard to the 2022 financial statement that contained a valuation for Celerit, Terry testified that Ben had always prepared the parties' personal financial statements, including that one, and that she had never assisted in their preparation. Ben valued Celerit at $19,675,000 in the 2022 financial statement. Terry testified that she did not conduct independent research regarding that valuation, did not assist in preparing the financial statement, and—aside from Steven Schroeder, the expert she hired for the divorce hearing—had never hired an independent business appraiser, CPA, accountant, or other professional to value Celerit. She said that the balance on the LOCs in 2022 was $4,000,000 and that if she had not agreed with the valuations Ben gave to the bank, the bank would have foreclosed on the loans.

She admitted that she knew "bits and pieces" about the gold-mining venture in the beginning but said Ben had never consulted her about it and she had no idea that he had been investing millions of dollars into equipment, travel, and attorney's fees connected with the venture. She said that she learned about the purchase of a $230,000 airplane for the gold-mining investment the morning he wired funds for the plane. She said that she told him not to do it. Regarding the other funds spent by Ben, Terry learned that he had been

9

spending millions after she was served with divorce papers and began preparing "accounting work." When she learned about the monthly treasure-hunting payments, she said it would have been impossible to prevent Ben from using the LOC and their joint checking account to make the payments since he had equal access to the accounts and did not need her approval. She said that she did not want any interest in either the gold-mining or the treasure-hunting ventures.

Terry testified that Ben had taken a minimum of $4 million from marital assets over a seven-year period for what amounted to gambling, that he had maxed out their LOCs, that he had not put one penny into the parties' joint accounts or paid anything towards their LOCs, that the gold-mining and treasure-hunting ventures were not investments but "scam[s]," and that he could not even explain where any of the money went. She asked the court for credit or for an unequal division of property to compensate her for the $4 million he spent on those ventures and for the $498,570.69 in interest payments she made on the LOCs Ben maxed out to pay for the ventures. She also asked the circuit court to credit her for the $154,996.32 Ben received as an early property settlement after the May 2023 hearing and for reimbursement for a $13,907 check he wrote to his attorney from their joint account after the court had already awarded him $154,996,32 to pay his attorney.

Ben testified that he had not been involved with Celerit for about a decade but said he did prepare the financial statement in December 2022, which included a value for Celerit of $19.675 million. He included a value of $2 million for the data center used by Celerit Solutions. He said they had never found anyone who would appraise the building as a data

center—including all the fiber-optic loops and electronic equipment, raised floors, lowered ceilings, and security—rather than as an office building, so he had to "fudge" the $2 million number. Regarding his method for valuing Celerit at $19 million, he said that he used a "template" that came from his accounting firm because he did not like paying the accounting firm to prepare a financial statement that he could prepare himself and said that he had used EBITDA[4] to assign a value. However, he could not explain exactly how he used the EBITDA formula to arrive at a precise number.

Ben said that since the temporary order, he had used the parties' LOCs to purchase $200,000 worth of Sollensys stock (which was worthless at the time of the hearing), to continue investing in the gold-mining venture, and to make the payments for the treasure-hunting venture in the Philippines. He said he did not have a checking account and did not deposit money into the parties' joint checking account; rather, he said that he used funds from oil and gas investments, rental payments, and the $154,996.32 the court awarded him in May 2023. However, he admitted writing a check in July 2023 from the parties' joint checking account for $13,907 to pay his attorney. He acknowledged that the court had specifically awarded him "an early division of property [of] $154,000" in May to make this payment, but he justified the $13,907 check because he did not think the $154,000 was "specific for that cause."

---

[4]EBITDA stands for earnings before interest, taxes, depreciation, and amortization.

Ben said that he invested in gold mining in 2016 due to the "benefits of the taxation." He testified that he had no background in gold mining and that Terry had less knowledge or experience than he did. He also said that Terry had "negligible involvement" with the gold-mining investment. He admitted that he had spent $1 million on equipment for the gold-mining operation in addition to investing in leases. He conceded that he had never received a return on his gold-mining investment and that no gold had been found.

Regarding the Philippines treasure-hunting venture, Ben testified that in 2017, after getting Mr. Ellis's name from Norman Missionaries and doing some "internet research," Ben had hired Mr. Ellis. Ben did not meet Mr. Ellis until February 2023 in Las Vegas, six years after his initial investment. Ben said that he paid Mr. Ellis a lump sum of $150,000. Shortly thereafter, Ben then began paying Mr. Ellis $12,600 each month through June 2023. He testified that the fee was paid by Ms. Johns or him. This monthly amount did not include the purchase or repair of equipment, which Ben occasionally paid for. He said that Terry was not told about the initial investment in this venture but that she was told about it after she recovered. Ben said that he had never traveled to the Philippines, that Mr. Ellis had never found treasure, and that he (Ben) did not have a written contract with Mr. Ellis. Ben said that he and Mr. Ellis had a verbal agreement to split any treasure that was found.

Karen Johns testified that she had been paying the parties' living expenses since before the divorce was filed and that she used money from their joint checking account to pay both parties' expenses after the divorce was filed unless funds in that account were insufficient, in which case she drew on the LOCs. She said that all the money in the joint checking account

was put there by Terry. Ms. Johns testified that since the divorce had been filed, Terry's monthly expenses were approximately $11,000 and Ben's were approximately $30,000. She said the balance on all three LOCs was about $3.5 million and that Ben had withdrawn a total of $1,208,920 since he filed the complaint for divorce. She explained that none of the withdrawals by Ben related to his monthly expenses, credit-card expenses, or home repair, all of which she had paid. She testified that the interest paid since July 2020 on all three LOCs was $498,570.69.

Ms. Johns provided the following explanation about her QuickBooks exhibit detailing the parties' expenses. She said that Terry had no involvement in the parties' personal financial affairs, did not know how much the parties spent, did not assist in the preparation of taxes, and had never asked to see the QuickBooks documents. Ms. Johns said that Ben handled all the parties' personal finances. She said that since 2016, Ben had spent $4,082,647.86 on treasure hunting and gold mining. She also testified that Terry did not know anything about Ben's Philippines treasure-hunting investment until after the divorce had been filed. Ms. Johns testified that Ben told her that he did not want to tell Terry because of her heart attack and that he felt like "God wanted him" to treasure hunt in the Philippines. She said Terry discovered the payments after Ben had filed for divorce. Terry was sitting at Ms. John's desk with Ms. Johns going through QuickBooks after her attorney requested that she review the accounting records. Terry noticed the monthly expenditures and asked about them. Ms. Johns said that Terry was "appalled" when she explained what the payments were for.

Finally, Steven Schroeder, a business appraiser hired by Terry, testified regarding Celerit's value. He said he had forty years of experience in appraising businesses and appraised approximately twenty-five businesses each year. In his opinion, "the value of the stock in Celerit . . . is eight million eight hundred thousand dollars ($8,800,000)." He said that he had reviewed historical information back to 2015, that the profit margins had been declining over the past four years, and that the loss of part of the BancorpSouth business after the merger in 2021 with Cadence Bank was going to have a major impact on Celerit. He said that that the merger may not have a significant effect on revenue, but it would have an effect on profit because the larger banks do not need as many of the services or consultants that Celerit provides.

Mr. Schroeder said that he used three methods to appraise Celerit: (1) the single-period-capitalization method, which indicated a value of $6.285 million; (2) the market-based-EBITDA-multiplier method, which indicated a value of $10.44 million; and (3) the market-based-revenue-multiplier method, which indicated a value of $10 million. He testified that he considered the failed Sollensys sale when evaluating Celerit,[5] but he did not find it relevant because it occurred in 2021—before the impact of the BancorpSouth merger—and Mr. Schroeder evaluated the company as of May 2023; the Sollensys sale was never completed and thus was not a "sale" to establish value; Sollensys was a synergistic purchase since Sollensys wanted to use Celerit to enhance its own operations; and, finally, the Sollensys sale

---

[5]Terry testified that the value of Celerit's stock at the time of the potential Sollensys sale was $28 million.

included real estate and Mr. Schroeder valued only the stock of Celerit, not real estate that was not owned but only leased by Celerit.

Mr. Schroeder said he did not think Ben's opinions of Celerit's value were "legitimate" because no one had explained the basis for Ben's opinions. Ben said he obtained "an EBITDA multiplier" from an accountant, but Mr. Schroeder explained that absent detailed information about a company, an "off the cuff EBITDA multiplier" is as "common as [a] bellybutton[], everybody has one." He said that without getting data and performing an examination, it might be admissible in court, but it was not relevant to his analysis. Finally, Mr. Schroeder also said that he reviewed the appraisal associated with the real estate, which indicated a value of $1.65 million for the office building and data center Celerit leased from CRE Holdings, but he admitted that he did not independently prepare a property valuation of the buildings.

Ben introduced the testimony of Dr. Ralph Scott, an economics professor at Hendrix College. Dr. Scott testified that he had never been certified as a business-valuation expert in a divorce case, that he remembered only one instance in which he had valued a closely held corporation, that he was not a certified public accountant, that he had taken no specialized training courses on business appraisals, and that he was not a member of any organization accredited for the appraisal of privately owned companies. He said that most of his litigation experience had been in personal-injury cases. He said that he was certified as an economist and that, as such, he could "handle" the valuation of businesses. He admitted that he had never met with any Celerit management employees and that he did not prepare an

independent written report of the value of Celerit. Dr. Scott said he had a "general valuation based on the testimony" he had heard.

Dr. Scott said that his main difference in opinion with Mr. Schroeder was Mr. Schroeder's failure to consider the sale of Celerit to Sollensys for $28 million in his analysis. Although admittedly not consummated, Dr. Scott found the sale relevant because it was an actual sale of Celerit, not simply the sale of a comparable company. He also believed that the $19.675 million value placed on Celerit by the parties in their financial statement was relevant. Finally, he testified that Mr. Schroeder relied too heavily on the first five months of 2023 in trying to project the future. Dr. Scott preferred looking at three to five years of performance, suggesting that the 2023 numbers could simply be a "blip on the radar." Dr. Scott opined that the value of Celerit should be $18.736 million. Terry objected to allowing Dr. Scott to provide an opinion of value because he was simply a rebuttal witness to Dr. Schroeder and did not have a formal, independent written report. The court found that Dr. Scott's opinion of the value of Celerit was outside the scope of rebuttal, explaining "all that we're looking at is whether or not we should believe Mr. Schroeder."

The court entered an order[6] on October 6, 2023, valuing and dividing the parties' marital assets and debts and finding that Ben engaged in the wrongful dissipation of marital assets. Terry filed a posttrial motion for reconsideration, amendment, and clarification asking the court to clarify its order regarding certain bank accounts, retirement accounts,

---

[6]While titled "Order," the circuit court later referred to this pleading as the original divorce decree.

and royalties. She also pointed out a "typographical error" in the court's decision awarding Ben a credit for the difference in value of the parties' respective residences rather than awarding her a credit since Ben's property appraised for a higher amount than Terry's. Finally, Terry alleged that it was "unclear what mathematical formula" the court intended to utilize to apply the various credits and distributions and asked the court to "clarify how the credits and awards are calculated in the final division of property and the terms and conditions of any equalizing payments needed." Ben filed a posttrial motion for amendment of findings of fact and conclusions of law, for new trial, for judgment notwithstanding the verdict, and for relief from judgment.

On November 20, the court entered an order granting in part and denying in part Terry's posttrial motion and denying Ben's posttrial motion and also entered an amended and substituted decree of divorce. The court incorporated its order into the amended and substituted decree. Relevant to this appeal, the amended and substituted decree provided that Terry "shall receive a credit for half of the marital funds" spent in furtherance of the treasure-hunting ventures in the amount of $2,041,323.93; Terry "shall be reimbursed" for half of the interest payments she made on the LOCs from the time the divorce was filed; Terry "shall receive a credit" for the early division of property in the amount of $154,996.32 that Ben received; and Terry "shall be entitled to credit in the amount of $13,907.50 for the check Ben wrote from the parties' joint checking account to his attorney. The court valued Celerit at $10 million and the office building and data center used by Celerit at $1.65 million. It awarded both buildings to Terry, who is to pay Ben for his 50 percent interest in

both. Finally, the court awarded Terry the Little Rock home and Ben the Heber Springs home, finding that the Little Rock home appraised for $1.34 million, and the Heber Springs home appraised for $2.4 million. The court found that Terry should receive credit in the amount of the difference in value: $1.060 million. Ben's appeal followed.

## II. *Standard of Review*

We review domestic-relations cases de novo on appeal and will not reverse a circuit court's findings unless they are clearly erroneous. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). In reviewing a circuit court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Id.* at 157, 61 S.W.3d at 224. Moreover, we will not substitute our judgment on appeal as to the exact interest each party should have but will decide only whether the order is clearly wrong. *Jones v. Jones*, 2014 Ark. 96, at 7, 432 S.W.3d 36, 41 (citing *Pinkston v. Pinkston*, 278 Ark. 233, 644 S.W.2d 930 (1983)).

## III. *Discussion*

### A. Reimbursements

For his first point on appeal, Ben challenges the circuit court's findings in the amended and substituted decree (1) that he repay half the interest due on the parties' LOCs while the divorce was pending, (2) that Terry receive a credit for half of every dollar he spent gold mining and treasure hunting, (3) that Terry receive a credit for the $154,996.32 awarded to Ben while the divorce was pending, and (4) that Ben reimburse Terry for $13,907 in attorney's fees that he paid while the divorce was pending.

18

1. *Gold-mining and treasure-hunting expenses and LOC interest*

Because Ben's first two reimbursement arguments are related and decided by the circuit court under the heading "Unequal Property Division," we will address them together. After an explanation of the factors a court must consider when awarding an unequal distribution of property, an extensive rendition of the facts surrounding Ben's investment in the gold-mining and treasure-hunting ventures, its finding that Ben lacked credibility when discussing the parties' finances and his treasure-hunting ventures, its determination that Ben's spending was "reckless" and constituted a "wrongful dissipation of marital assets," and its finding that Terry was entitled to an unequal division of property, the circuit court awarded a $2,041,323.93 credit to Terry for half of the marital funds that Ben spent on these investments, which was $4,082,647.86. The court also found that Ben had used the parties' LOCs to continue paying for these investments after the divorce had been filed and the temporary order entered, which led to excessive principal balances and, consequently, to excessive amounts of interest accumulation. Accordingly, the court also ordered Ben to reimburse Terry $249,285.35 for half of the interest she had paid servicing the three LOCs while the divorce was pending, which totaled $498,570.69.

On appeal, Ben recognizes that a court has broad powers to distribute property and may make an unequal distribution of property, but he argues that the $2,041,323.93 credit to Terry was not an unequal distribution of marital property but rather a reimbursement of funds spent during the marriage. Similarly, he argues that the LOC interest payments are not debt for the court to divide because the amounts have been paid with marital funds. He

19

claims that income earned and spent during the marriage is not subject to reimbursement or division unless the money was spent on a paramour or with the fraudulent intent of divesting the other spouse of the funds.

In support of his argument that the issues do not involve the unequal distribution of property but rather the direct reimbursement of funds spent during the marriage, Ben relies on *Johnson v. Cotton-Johnson*, 88 Ark. App. 67, 194 S.W.3d 806 (2004), and *Chism v. Chism*, 2018 Ark. App. 310, 551 S.W.3d 394. These cases do not support Ben's argument.

In *Johnson*, we affirmed in part and modified a circuit court's order requiring Arthur to reimburse Renita for one-half of the total amount in gifts he had purchased for two paramours during the parties' marriage. Although we recognized in *Johnson* that a court may divide property unequally when one spouse has diverted marital assets to a paramour, we reduced the amount that the court awarded for gifts that Arthur gave to one of the paramours because Arthur and Renita had reconciled after the gifts were made. *Id.* at 83, 194 S.W.3d at 815. We stated that reconciliation after the gifts was "tantamount to a forgiveness of the manner in which marital funds were spent" and that Renita should be precluded from seeking reimbursement of those funds to the marital estate. *Id.*, 194 S.W.3d at 815. However, we affirmed the gifts made to the other paramour where there was no evidence that the parties reconciled after Renita knew of the gifts. *Id.*, 194 S.W.3d at 815.

This court clearly indicated in *Johnson* that the circuit court could distribute property unequally on the basis of misspent marital funds and affirmed in part the court's order doing so. Here, there is no evidence that Terry "forgave" Ben's wasteful spending. In fact, the

evidence suggested that Terry had no idea about the spending and did all she could to prevent Ben's continued spending on the ventures once she discovered it.

In *Chism*, the circuit court divided the parties' marital and nonmarital property and then found that Evelyn's earnings and retirement benefits that had been paid between 2002 and 2013 (the year before the divorce was filed) had been kept in a separate account in her separate name and that Evelyn had failed to account for the money. The court awarded a judgment to Jim for $118,000, representing one-half of the sum earned. Evelyn argued on appeal that a spouse is not entitled to be reimbursed in a divorce proceeding for every nonconsensual transfer of marital funds made by the other spouse in the absence of an intent to defraud; that there was insufficient evidence that she had spent the funds with the intent to defraud Jim; and that only $20,000 remained in the account at the time the parties separated, which the court had already divided. 2018 Ark. App. 310, at 5, 551 S.W.3d at 397–98. We reversed the judgment, holding there was no evidence presented, and Jim did not argue, that Evelyn concealed or disposed of her property in an attempt to defraud him and that the court's equal division of the account was based on the balance at the time of separation. *Id.* at 398, 551 S.W.3d at 6.

*Chism* is inapposite to the instant case. Unlike in *Chism*, the court here did not award Terry a judgment based on unaccounted-for funds. Rather, the court specifically made an unequal distribution of property and properly stated its reasons for doing so. Moreover, the court here specifically found that Ben's treasure hunting was a wrongful dissipation of the marital assets and amounted to fraud against Terry.

21

Arkansas Code Annotated section 9-12-315 (Repl. 2020) grants the circuit court broad powers in distributing both marital and nonmarital property to achieve an equitable division. *Keathley*, 76 Ark. App. 150, 157, 61 S.W.3d at 224. The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Id.*, 61 S.W.3d at 224. All marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. Ark. Code Ann. § 9-12-315(a)(1)(A). The court may make an unequal division of marital property if it finds some other division equitable taking into consideration certain factors listed in the statute, but the circuit court must state the reasons and basis for not dividing the property equally, which should be recited in the order entered in the matter. Ark. Code Ann. § 9-12-315(a)(1)(A), (B). The court is not required to list each factor, weigh each factor equally, or limit itself to the factors listed. *Kelly v. Kelly*, 2014 Ark. 543, at 8, 453 S.W.3d 665, 661.

In the case at bar, the circuit court made an unequal distribution of marital property when it awarded Terry a credit for half of Ben's investment expenses and reimbursement for half of the LOC interest she paid on those expenses. The court issued these awards in its decree under the heading "Unequal Property Division," and the court set forth the factors it was required to consider pursuant to section 9-12-315(a)(1)(B) when making this unequal division of marital property. Focusing on the factor regarding each party's contribution to the "acquisition, preservation, or appreciation" of marital property, the court found that Ben used Terry's trust in him to spend their funds in a "covert, wasteful fashion" while Terry

22

worked hard to accumulate marital assets. It credited Terry's and Ms. John's testimony that Terry was not aware of Ben's investment in the Philippines treasure-hunting venture until after the divorce had been filed. The court was "not persuaded" by Ben's testimony that Terry should have known about the venture from the parties' tax returns, and it found that Ben's "reckless spending went unchecked for years because he hid it from Terry." The court likened Ben's behavior to one who goes to a casino month after month for seven years, spending tens of thousands of dollars gambling, but having nothing to show for it. The court specifically found that Ben's actions amounted to "fraud against Terry." Consequently, it awarded 100 percent of the assets and debts of the parties' gold-mining and treasure-hunting ventures to Ben and found that Terry "shall receive a credit for half of the marital funds" Ben spent on these ventures. The court also found that Ben continued to invest in these ventures after the divorce had been filed and after Terry had quit funding the expense, maxing out the parties' LOCs. The court found that Ben's use of the LOCs led to the excessive balances and interest accumulation, found that both parties should bear the expense equally, and ordered Ben to reimburse Terry for half of these interest payments.[7]

---

[7]We note that the court did not order Ben to reimburse Terry for all interest paid on the parties' LOCs during the marriage but only for the interest it found attributable to Ben's excessive and wasteful spending during the parties' separation and pending divorce. In spite of the temporary order's provision barring either party from borrowing more than $250,000 from his or her designated LOC without written approval from the other party, Ben was responsible for maxing out all three LOCs. The court found this violated the temporary order, took this violation into account in its decision to order credits and reimbursements, and found that compliance with its order would purge the contemptuous behavior.

The circuit court compared Ben's actions to the husband's depletion of the marital estate in *Keathley*. In *Keathley*, this court affirmed an unequal division of property to the wife after the circuit court found that the husband depleted the marital estate through gambling losses while the wife was working to accumulate assets. 76 Ark. App. at 155, 61 S.W.3d at 223. The husband in *Keathley*, like Ben in this case, handled the parties' finances while the wife worked to earn income. The circuit court found that the wife did not know about the husband's continuing gambling losses, had no reason to suspect that he was accumulating credit-card debt in her name, and found that his actions rose to the level of fraud against the wife. *Id.* at 155, 61 S.W.3d at 223.

Similarly, in *Thakar v. Thakar*, 2022 Ark. App. 284, 646 S.W.3d 666, this court affirmed the circuit court's unequal division of property in favor of the wife where evidence established that the husband handled the parties financial affairs during the marriage and transferred considerable assets from the parties' joint accounts to accounts in India and to his family members without the wife's knowledge or consent. The husband argued that he no longer had all the funds and that the circuit court made no finding that he had committed fraud, as he contended the supreme court required. We affirmed the court's order, stating that fraud included a "scheme of deceit," which the circuit court found existed. *Id.* at 7, 646 S.W.3d at 670–71. *See also Skokos v. Skokos*, 332 Ark. 520, 535, 969 S.W.2d 26, 34 (1998) (holding that to entitle a spouse to reimbursement of funds spent during the marriage, he or she must demonstrate a nonconsensual transfer of marital funds was made with the "specific intent" to defraud them of their interest in the property).

24

We do not have a definite and firm conviction that a mistake was made as to the circuit court's findings that Terry is entitled to a credit for one-half of the marital funds spent on the gold-mining and treasure-hunting ventures and that Ben reimburse Terry one-half of the LOC interest she paid on those expenses during the divorce. As we have previously explained, we will not substitute our judgment on appeal as to the exact interest each party should have but will decide only whether the order is clearly wrong. *See Pinkston*, 278 Ark. at 235, 644 S.W.2d at 931. Any exception to the rule of equal distribution will always depend on the specific facts as reflected by the circuit court's findings and conclusions. *Kelly*, 2014 Ark. 543, at 10, 453 S.W.3d at 662. Our review of the extensive record in this case does not convince us that the court's order is clearly erroneous, and we affirm this point.

## 2. *$154,996.32 and $13,907*

### i. $154,996.32

Ben argues that the circuit court clearly erred by ordering him to reimburse Terry for the $154,996.32 that the court awarded him after the May 2023 hearing and by ordering him to reimburse Terry for the $13,907 he paid his attorney from the parties' joint account two months later. Ben contends that there was no evidence that he still possessed the money at the time of the final hearing and that it was money spent during the marriage from the marital estate. Therefore, as he previously argued, he contends that a court may not order a party to account for money spent during the marriage absent evidence of fraud. He also contends that Terry paid her attorney from the parties' joint account and that nothing prevented him from doing the same thing.

Regarding the $154,996.32 award to Terry, we agree with Terry that Ben acquiesced in the court's decision. In Ben's proposed findings of fact and conclusions of law filed immediately after the final hearing, Ben deducted this amount from his share of the marital estate. An appellant may not complain on appeal that the court erred if he induced, consented to, or acquiesced in the court's position. *Keathley v. Keathley*, 76 Ark. App. 150, 163-64, 61 S.W.3d 219, 228 (2001). Accordingly, we decline to reach this issue on appeal.

## ii. $13,907

We now turn to the court's decision that Ben must reimburse Terry $13,907 for the attorney's fees he paid from the parties' joint checking account rather than the $154,996.32 earmarked for Ben's expenses. Terry contends that this issue is not preserved for appeal because Ben failed to raise the issue in his posttrial motion. We disagree and take this opportunity to clarify our case law.

This court has held that an issue is not preserved for appeal if an appellant failed to object to the issue on appeal during both the pendency of the case in the circuit court and in a posttrial motion to the circuit court. In *Dace v. Doss*, 2017 Ark. App. 531, 530 S.W.3d 893, this court held that Dace's argument that the court erroneously considered evidence outside the record regarding Doss's tax returns was not preserved for appeal because Dace's counsel did not object during the discussion of preparing an affidavit of expenses or to the court's consideration of evidence outside the record. Later, when Dace was provided with the disputed information, and later still in his posttrial motion, Dace did not object to the

26

circuit court's use of the information. We held that Dace raised this issue for the first time on appeal; thus, we would not consider his argument.

Similarly, in *Hartman v. Hartman*, 2024 Ark. App. 194, this court held that the issue the appellant raised on appeal regarding the circuit court's alimony and child-support calculations was not preserved for appeal because the circuit court specifically reserved the issue of alimony and child support to be decided after the decree was entered. The court invited the parties to file briefs on the issues. The appellant failed to raise the issue in his posttrial brief. Specifically, our court held that

> Jodie elected not to address the issue of child support in his brief, nor did he respond to the options for child-support calculations that Candie proposed in her posttrial brief. Then, when the circuit court issued its letter opinion setting forth its gross-income calculations for purposes of child support, Jodie again failed to object on this ground. . . . Here, Jodie had ample opportunity to object to the court's calculations prior to the entry of the divorce decree and did not do so.

2024 Ark. App. 194, at 13–14.

Both *Dace* and *Hartman* are inapposite to the instant case because Ben raised the issue of reimbursement to Terry for his attorney's fees at the circuit court level; thus, unlike Dace and Hartman, the issue was not raised at the appellate level for the first time on appeal. We decline to hold, as Terry urges, that Ben's failure to object in the posttrial motion precludes him from raising the issue on appeal because we would be creating a bright-line rule without supporting precedent.

Regarding the court's order for Ben to reimburse Terry $13,907, the circuit court found that Ben "unapologetically admitted at trial that he wrote a check [for attorney's fees]

27

out of the parties' joint bank account" for this amount to pay his attorney "rather than utilizing the $154,996.32 awarded to him in May for that exact purpose."[8] The court was within its discretion to order reimbursement of both the $154,996.32 amount of the award to Ben for expenses and the $13,907 he paid for attorney's fees to account for his use of money earmarked for his expenses to fund his fraudulent treasure-hunting venture. As stated above, the court has broad powers to distribute property to achieve a distribution that is fair and equitable under the circumstances, and under the facts of this case, we find no error and affirm. *Coatney v. Coatney*, 2010 Ark. App. 262, 377 S.W.3d 381.

## B. Value of Celerit

Ben also challenges the circuit court's valuation of Celerit. He argues that the court's finding that Celerit was worth $10 million was clearly erroneous. First, he claims that the circuit court ignored relevant evidence of value in favor of Mr. Schroeder's valuation. Specifically, Ben argues that Mr. Schroeder gave the Sollensys sale no weight. Second, Ben argues that Mr. Schroeder's valuation included only the stock and that the circuit court therefore clearly erred by including the business accounts in the $10 million valuation collectively with the stock, although he does not specify which accounts.

The only expert witness who appraised Celerit was Terry's expert, Mr. Schroeder. Mr. Schroeder testified that he had forty years of experience in appraising businesses and had

---

[8]We note that it was undisputed that Ben contributed nothing to the joint checking account, that all his expenses were being paid from marital funds by Ms. Johns, and that he did not place any of the marital funds he received—checks for oil and gas royalties, rent, and the $154,996.32—into the joint account but kept these amounts in cash in his safe.

appraised approximately twenty-five businesses each year. He provided a forty-seven-page appraisal with a detailed financial analysis of Celerit's balance sheets and income statements and set forth the three methods he used to arrive at his opinion of the company's value. He testified that he considered the failed Sollensys sale when evaluating Celerit and explained why he did not find it relevant to his analysis. Ben then presented the testimony of Dr. Scott to rebut Mr. Schroeder's opinion, but neither Ben nor Dr. Scott provided a separate appraisal or evidence of an alternative value for Celerit.

The court considered this evidence, set forth two pages of detailed findings, and valued Celerit at $10 million. Mr. Schroeder's appraisal (on which the court relied) was based on the company's financial statements, which included the company's bank accounts. The circuit court specifically mentioned Sollensys, Terry's testimony regarding the failed Sollensys transaction, and Mr. Schroeder's models that included comparable sales. In fact, while the court recognized that Mr. Schroeder used three methods to arrive at his valuation of $8.8 million, the court specifically found that the two methods using comparable sales were the most reasonable valuations, leading the court to its $10 million value. The court also recognized that Dr. Scott did not offer an independent appraisal of the company. And although Ben testified that Celerit was worth anywhere between $10 million and $30 million, he did not present an accountant or other expert to confirm his opinion, and the circuit court specifically found that Ben's testimony discussing the parties' finances lacked credibility.

Ben's argument is nothing more than a request that we reweigh the evidence and evaluate it differently than did the circuit court, which we will not do. *See Williams v. Williams*, 2019 Ark. App. 186, at 19, 575 S.W.3d 156, 166. The circuit court was required, as the trier of fact, to determine the credibility of witnesses and to resolve conflicting testimony. *Thakar*, 2022 Ark. App. 284, at 4, 646 S.W.3d at 670. On appeal, we will not disturb a circuit court's resolution of disputed facts or determinations of credibility because these are within the province of the finder of fact. *Id.* at 7, 646 S.W.3d at 671. This court will reverse the circuit court's valuation of a business only if it is clearly erroneous. *Fowler v. Fowler*, 2023 Ark. App. 543, at 4, 680 S.W.3d 68, 71.

Ben has not demonstrated that the circuit court clearly erred on this point. He failed to offer his own appraisal or provide any expert evidence to support his opinion. Terry presented expert testimony, supported by a forty-seven-page appraisal, that was deemed credible by the circuit court. In short, Ben's arguments on appeal attempt to parse out various components of Terry's expert's opinion, but this was a matter for the circuit court to consider and resolve. Our de novo review of the evidence convinces us that the circuit court did not clearly err in its valuation of Celerit, and we affirm this point.

### C. Value of the Office Building and the Data Center

The circuit court valued the office building and data center at $1.65 million and ordered Ben to receive a credit for $825,000. Ben contends that the circuit court clearly erred in its valuation of the buildings because it failed to consider all the relevant evidence and based its determination of value on an appraisal that was not entered into evidence.

In its decree, the circuit court found that the buildings were vital to the continuing operation of Celerit and awarded them to Terry. Neither Ben nor Terry entered an appraisal of the buildings into evidence, and the court based its determination of value on the testimony of Terry and Mr. Schroeder. Both testified that an appraisal had been performed in connection with the potential sale of Celerit to Sollensys in 2021, which valued the properties at $1,65 million. The court stated that no other credible evidence regarding the properties was presented, specifically noting Ben's lack of credibility.

The opinion of the owner of real estate is generally admissible on the question of its value, regardless of the owner's knowledge of market values. *Enter. Sales Co. v. Barham*, 270 Ark. 544, 547–48, 605 S.W.2d 458, 459 (1980). That testimony must, however, be based on facts that support the owner's opinion. *Ark. State Highway Comm'n v. Geeslin*, 247 Ark. 537, 541, 446 S.W.2d 245, 247 (1969). Value cannot be based on a figure plucked from the air. *Ark. State Highway Comm'n v. Stanley*, 234 Ark. 428, 353 S.W.2d 173 (1962). The court did not err by relying on Terry's opinion, as the owner of the real estate, of the value of this real property, even though the appraisal on which her opinion was based was not admitted into evidence. This figure was not "plucked from the air" and is the only value presented regarding the buildings. We hold that the circuit court's valuation of the real estate was not clearly erroneous and affirm this point.

### D. Home Values

Ben contends that the circuit court clearly erred by unequally dividing the parties' homes without offering an explanation for the unequal division. The court awarded Terry

31

the Little Rock home and Ben the Heber Springs home, finding that the Little Rock home appraised for $1.34 million, and the Heber Springs home appraised for $2.4 million. The court then found that Terry should receive credit in the amount of $1.06 million—the difference in value between the two homes. Ben argues that the court gave no justification for its unequal division and should have awarded Terry half of the difference between the homes—$530,000—so that each party would have $1.87 million in home value.

It is unclear in the circuit court's decree whether it intended to equally or unequally divide the value of the parties' homes. If the court intended to equally divide it, it failed to do so. Under the circuit court's analysis, Terry's home value is now $2.4 million, and Ben's home value is $1.34 million. If the court intended to unequally divide the value of the homes, it failed to provide any explanation for an unequal division. Therefore, we agree with Ben that the circuit court clearly erred in dividing the value of the parties' homes.

We do not hold that the circuit court must divide the value of the homes equally or unequally, but if it chooses to divide it unequally, it is required to explain why an unequal division is equitable and state its basis and reasons in the order. Ark. Code Ann. § 9-12-315(a)(1)(B). Accordingly, we reverse and remand the issue of the division of the value of the parties' homes for the circuit court to either divide the marital property one-half to each party or to make some other division that it deems equitable and provide written findings that support the unequal division. *See Branscum v. Branscum*, 2022 Ark. App. 126, at 5–6, 642 S.W.3d 270, 274.

Petition for rehearing granted in part; affirmed in part; reversed and remanded in part.

TUCKER and HIXSON, JJ., agree.

KLAPPENBACH, C.J., and WOOD, J., concur.

HARRISON, J., concurs in part and dissents in part.

**WENDY SCHOLTENS WOOD, Judge, concurring**. Rehearing should not have been granted in this case. First, Ben failed to preserve his challenge to the $13,907 attorney's-fee reimbursement. Although the majority states that Ben raised the issue of the reimbursement at the circuit court level, he did not. Terry asked the circuit court to reimburse her for the $13,907 check Ben wrote to his attorney from the parties' joint account shortly after the court awarded Ben $154,996.32 specifically for that purpose. In response, Ben stated that he did not think the $154,996.32 was "specific for that cause."

At the conclusion of trial and before the circuit court made findings on this issue or any other, it requested proposed findings of fact and conclusions of law. Ben proposed no findings at all regarding the $13,907, and Terry asked the court to credit her for this amount. The court entered an order reimbursing Terry for the $13,907 attorney's-fee payment. After the initial order was entered, both parties filed motions for reconsideration. Ben's posttrial motion asked the circuit court to correct ten specific alleged errors in its order. Once again, however, he failed to challenge or even mention the $13,907 credit. Thereafter, the circuit court entered an amended and substituted decree addressing the issues raised by Ben and

33

Terry in their posttrial motions. The amended decree, like the initial decree, included the $13,907 credit to Terry, as she had requested.

"[I]t is incumbent upon the parties to raise arguments initially to the circuit court and to give that court an opportunity to consider them. . . . Otherwise, we would be placed in the position of reversing a circuit court for reasons not addressed by that court." *Roberts v. Roberts*, 2009 Ark. 567, at 8, 349 S.W.3d 886, 891. Although I recognize that a party is not generally required to raise issues in a posttrial motion in order to preserve them for appeal, a party who files such a motion specifically challenging the circuit court's order creates an opportunity to bring all issues *regarding the order* to the attention of the circuit court. Therefore, challenges to the order that could be and are not raised in that motion are not preserved for appellate review. *See, e.g.*, *Hartman v. Hartman*, 2024 Ark. App. 194, at 14, 17 (holding that issues raised by the appellant on appeal were not preserved when they could have been but were not raised after a hearing in a divorce case where a variety of other issues were raised and addressed in posttrial motions, a letter opinion, and proposed orders of counsel); *Dace v. Doss*, 2017 Ark. App. 531, at 8, 530 S.W.3d at 898–99 (holding that Dace failed to preserve his appellate argument because he failed to raise it in his posttrial motion); *Redwine v. Turner*, 2011 Ark. App. 251, at 8–9, 378 S.W.3d 866, 871–72 (holding that this court was precluded from reviewing an issue that Redwine did not object to at trial or raise in her posttrial motion).

The majority distinguishes *Hartman*, stating that Ben raised the issue of reimbursement to the circuit court, unlike the appellant, Jodie, in that case. That is flatly

wrong. Ben never raised this issue but merely responded to Terry's request at trial that he did not know the $154,996.32 award had been specifically for attorney's fees. Then, like Jodie in *Hartman*, Ben did not address this issue in his proposed findings of fact before the court entered its initial order. Finally, after the initial order was entered reimbursing Terry for this amount, Ben, like Jodie, again failed to object to the award. This is in spite of the fact that Ben filed a posttrial motion for amendment challenging ten other alleged errors in the court's order. It is well settled that this court will not consider arguments raised for the first time on appeal. *Hartman*, 2024 Ark. App. 194, at 17; *Dace*, 2017 Ark. App. 531, at 8, 530 S.W.3d at 899.

Ben failed to preserve a second argument for appeal. Although not addressed in the majority opinion, Ben argued in his brief to this court that the circuit court should have ordered the office building and data center sold as required by Arkansas Code Annotated section 9-12-315(a)(3)(B) (Repl. 2020). This is contrary to his request in his proposed findings of fact in which he asked the court to award the office building and data center to Terry and award him one-half of their value, which is what the circuit court ultimately did. A party cannot complain when he or she has received all the relief requested. *Mikel v. Hubbard*, 317 Ark. 125, 129, 876 S.W.2d 558, 560 (1994); *Carton v. Mo. Pac. R.R. Co.*, 315 Ark. 5, 17, 865 S.W.2d 635, 641 (1993) (holding that an appellant—who asked for the ruling at trial—will not be heard to complain of the ruling in her favor).

Moreover, Ben did not raise this second argument at his first opportunity by including it in the posttrial motion he elected to file challenging the findings in the circuit

court's initial order. For the same reasons his argument about the $13,907 attorney's-fee credit is not preserved, his argument about selling the office building and data center is likewise not preserved. For these reasons, I concur in the majority's disposition of this case.

KLAPPENBACH, C.J., joins.

**BRANDON J. HARRISON, Judge, concurring in part and dissenting in part**. wholly join every part of the majority's opinion except Part III.A.2.i; and in that part, I dissent only from the majority's statement that Ben "acquiesced to the court's decision" to award Terry $154,996.32. I respectfully disagree with the majority's take on the significance of Ben's proposed findings of fact and conclusions of law in this case's context and course.

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellant.

*Kamps & Griffis PLLC*, by: *Adrienne M. Griffis*, for appellee.